OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Whitten, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

PIE Mutual Insurance Company, Appellant, v. Ohio Insurance
Guaranty Association, Appellee; Physicians Insurance Company of
Ohio, Appellant.
[Cite as PIE Mut. Ins. Co. v. Ohio Ins. Guar. Assn. (1993),
Ohio St.3d    .]
Insurance -- R.C. Chapter 3955 -- Purpose of Ohio Insurance
     Guaranty Association Act -- OIGA provides insurance
     coverage, when -- Insurance carrier that has settled an
     action with insured not entitled to seek payment from OIGA
     for pro-rata share of settlement amount on basis of
     common-law subrogation principles -- Former R.C.
     3955.01(B)(2), construed.
1.  The Ohio Insurance Guaranty Association Act, R.C. Chapter
        3955, was designed to protect insureds and third-party
        claimants from a potentially catastrophic loss due to
        the insolvency of a member insurer.  To this end, OIGA
        assumes the place of the insolvent insurance carrier
        for liability purposes only and provides insurance
        coverage when no other insurance is available to
        compensate valid claims.
2.  An insurance carrier which has settled an action with the
        insured or third-party claimant is not entitled to
        seek payment from OIGA for a pro-rata share of the
        settlement amount on the basis of common-law
        subrogation principles.  (Former R.C. 3955.01[B][2],
        construed.)
     (Nos. 91-2392 and 91-2399 -- Submitted January 20, 1993 --
Decided May 12, 1993.)
     Appeals from the Court of Appeals for Franklin County,
Nos. 91AP-184 and 91AP-206.
     This case arises from a settled medical malpractice action
filed by Marilyn H. Archer and James C. Archer against Anthony
Chila, D.O., and his employer, the Ohio University Osteopathic
Medical Center ("OUOMC") on April 27, 1988.  Dr. Chila provided
care to Mrs. Archer from November 9, 1982 through January 29,
1987 for complaints concerning her right shoulder.  It was
alleged that Dr. Chila failed to perform an x-ray examination
on Mrs. Archer's right shoulder on the initial office visit and

all subsequent office visits, resulting in a delay in diagnosis of a malignant chondrosarcoma. This delay resulted in severe and disabling injuries to Mrs. Archer that required extensive surgery. The tumor of which Mrs. Archer complained ruptured the humerus sometime between four and nine months prior to discovery of the tumor in February 1987 by another physician. If the tumor had been diagnosed in an earlier phase, there would have been less extensive resection of the bone and less residual disability.

Throughout the duration of Dr. Chila's treatment of Mrs. Archer, he and OUOMC were insured successively by three separate medical malpractice insurance companies. Defendant-appellant Physicians Insurance Company of Ohio ("PICO") provided coverage from November 9, 1982 to June 1, 1983; Professional Mutual Insurance Company ("PMIC") provided coverage from June 1, 1983 to May 23, 1986; and plaintiff-appellant PIE Mutual Insurance Company ("PIE") provided coverage from May 23, 1986 to January 29, 1987.

Defendant-appellee, the Ohio Insurance Guaranty Association ("OIGA"), entered the underlying medical malpractice litigation after PMIC was declared to be an insolvent insurer.1 OIGA retained counsel and joined in the defense of Dr. Chila and OUOMC with counsel retained by PICO and PIE. All three counsel participated in every aspect of the medical malpractice case, including extensive discovery, case evaluation and trial strategy. Settlement negotiations were thereafter commenced. On June 3, 1989, counsel for OIGA notified counsel for PICO and PIE that OIGA would not participate in settlement negotiations until the limits of the PICO and PIE policies had been exhausted. Approximately two weeks later, on June 19, 1989, the litigation with the Archers was settled for approximately $690,000. PICO and PIE contributed $300,000 each, while OUOMC contributed approximately $90,000.

On June 18, 1990, PIE filed an action against OIGA, PICO and OUOMC seeking a declaration of the respective rights and responsibilities of the various parties with regard to the settlement of the medical malpractice action. PIE claimed that PICO and/or OIGA was legally obligated to reimburse PIE for the $300,000 contribution PIE made to the settlement of the Archers' claim. In response to PIE's complaint, PICO filed a counterclaim against PIE and a cross-claim against OIGA. In its cross-claim, PICO sought a declaration that OIGA was responsible to contribute to the settlement.

On January 15, 1991, the court of common pleas granted OIGA's previously filed motion to dismiss both PIE's complaint and PICO's cross-claim pursuant to Civ.R. 12(B)(6). The court of appeals consolidated the appeals of PIE and PICO and affirmed the trial court's judgment.

The cause is now before this court pursuant to the allowance of motions to certify the record.


Jacobson, Maynard, Tuschman & Kalur Co., L.P.A., Gayle E. Arnold and Karen L. Clouse, for appellant PIE Mutual Insurance Company.

Vorys, Sater, Seymour & Pease and F. James Foley, for appellee.

Hammond & Willard and Gary W. Hammond, for appellant Physicians Insurance Company of Ohio.

Moyer, C.J.  This case presents for our consideration the extent of OIGA's liability under R.C. Chapter 3955.2  The central issue is whether OIGA is required to reimburse two insurance carriers for a pro-rata share of amounts the insurers paid to settle a medical malpractice action.

I

At the outset, it is important to recognize the General Assembly's purpose behind the enactment of R.C. Chapter 3955, the Ohio Insurance Guaranty Association Act (the "Act").  To this effect, former R.C. 3955.03 specifically stated:

"The purposes of sections 3955.01 to 3955.20, inclusive, of the Revised Code are to provide a mechanism for the payment of covered claims under certain insurance policies, avoid excessive delay in payment and financial loss to claimants or policyholders because of the insolvency of an insurer, assist in the detection and prevention of insurer insolvencies, and provide an association to assess the cost of such protection among insurers."  (Emphasis added.)

The Act was designed to guard against potentially catastrophic loss to persons who are entitled to rely on the existence of an insurance policy and the solvency of the company issuing the policy -- the insureds and persons who have claims against insureds.  OIGA, a nonprofit unincorporated association, was therefore created to provide a means to compensate insureds or third-party claimants when an insurance company is unable to meet its obligations.  Upon a determination that an insolvent insurer exists, OIGA assumes that insurer's obligations to insureds or third-party claimants while being empowered with all of the insurer's rights in that regard.  Former R.C. 3955.08(A)(2) and (4).  OIGA thereby assumes the place of the insolvent insurance carrier for liability purposes only and provides insurance coverage when no other insurance is available to compensate valid claims.  Former R.C. 3955.08 and 3955.13.  However, not all claims covered under the insolvent insurer's policy are payable by OIGA.  As a creature of statute, OIGA is restricted by the terms of the enabling legislation to pay only "covered claim[s]" as defined in former R.C. 3955.01(B):

"'Covered claim' means an unpaid claim, including one for unearned premiums, which arises out of and is within the coverage of an insurance policy to which sections 3955.01 to 3955.20 of the Revised Code apply, when issued by an insurer which becomes an insolvent insurer on or after the effective date of this act, and the claimant or insured is a resident of this state at the time of the insured event or the property from which the claim arises is permanently located in this state.

"'Covered claim' does not include any amount:

"(1) In excess of three hundred thousand dollars on any claim;

"(2) Due any reinsurer, insurer, insurance pool, or underwriting association through subrogation; provided, that when such reinsurer, insurer, insurance pool, or underwriting association has paid a claim and thereby becomes subrogated to

the amount of that claim, such subrogated claim may be asserted only against the receiver of the insolvent insurer and in no event against the insured of the insolvent insurer." (Emphasis added.)

The trial court correctly analyzed the statutory scheme set forth in R.C. Chapter 3955 in concluding that PIE and PICO do not have "covered claims." R.C. 3955.01(B) sets forth two requirements before OIGA can be called upon to pay claims of an insolvent insurance carrier. First, the individual seeking relief from OIGA must possess an unpaid claim. An unpaid claim is one which arose from an insured event and has yet to be satisfied either by the insolvent carrier or by OIGA. The second requirement limits the class of individuals who may seek relief from OIGA.3 Under a liability policy of insurance, only the insolvent carrier's insured or one who has been injured by that insured (i.e., a third-party claimant) may require OIGA to pay a covered claim.

It is obvious that the only relevant claim under R.C. 3955.01(B) is the one held by the Archers as third-party claimants regarding the medical malpractice insurance policies issued by PIE and PICO -- and that claim has been converted from an unpaid claim to a paid claim through settlement. R.C. Chapter 3955 was designed to protect insureds and third-party claimants, like the Archers, from the insolvency of an insurer. The monies reserved in the OIGA fund are clearly not for the protection of insurance companies. Since neither PIE nor PICO is an insured or third-party claimant (i.e., victim of tortfeasor) under an insurance policy, OIGA has no obligations under R.C. 3955.01(B).

PIE and PICO are pursuing what is more properly characterized a subrogation cause of action. In their declaratory judgment action, the insurers sought a binding judicial determination that they may seek reimbursement from OIGA for any amount paid by them in excess of their respective proportionate share of liability for the damages sustained by the Archers. Essentially, appellants sought a determination of their equitable subrogation rights against OIGA. "In a broad sense, one person is subrogated to certain rights of another person where he is substituted in the place of such other person so that he succeeds to those rights of the other person." State v. Jones (1980), 61 Ohio St.2d 99, 100-101, 15 O.O.3d 132, 133, 399 N.E.2d 1215, 1216-1217. To be entitled to the right of subrogation, the person who pays money to satisfy the obligation must be under some duty or necessity in order to protect himself from loss; the right cannot extend to a mere volunteer. "Subrogation is allowed only in favor of one who has been obliged to pay the debt of another, and not in favor of one who pays a debt in the performance of his own primary obligation." Maryland Cas. Co. v. Gough (1946), 146 Ohio St. 305, 32 O.O. 365, 65 N.E.2d 858, paragraph three of the syllabus.

As is readily apparent from the language of R.C. 3955.01(B)(2), the statutory provision specifically excludes from the definition of "covered claim" amounts claimed by insurance companies through common-law subrogation principles. PICO, however, interprets R.C. 3955.01(B)(2) to mean that a subrogation claim is not a "covered claim" if, and only if, the

subrogated party can assert that claim against the receiver of the insolvent carrier. Since PICO cannot obtain reimbursement from PMIC's receiver, PICO urges this court to hold that the statutory bar does not apply. We disagree. There is no reason to conclude that the Act intended a subrogated insurer which is somehow precluded from filing a claim against a fellow insurer's receiver to be given greater rights to the funds held by OIGA than a subrogated insurer which is not so precluded. Such an exception to OIGA's limited liability on "covered claims" would be inconsistent with the expressed purpose of the Act to protect only insureds and third-party claimants from financial ruin due to the insolvency of an insurer. The only recourse the appellants have is to assert their subrogated claims against PMIC's receiver.

Accordingly, we hold that an insurance carrier which has settled an action with the insured or third-party claimant is not entitled to seek payment from OIGA for a pro-rata share of the settlement amount on the basis of common-law subrogation principles. The subrogated claims of PIE and PICO were therefore properly dismissed by the trial court.

II

We next proceed to address the appellant insurers' arguments that OIGA acted in bad faith during the performance of its statutory duties. The appellants maintain that OIGA's wrongful refusal to participate in settlement discussions and then contribute to the negotiated settlement amount entitles PIE and PICO to bring an action seeking reimbursement from OIGA despite the language of R.C. 3955.01(B)(2). The insurers' argument, which is apparently based upon equitable estoppel grounds, is unpersuasive and we find no basis for such a bad-faith claim.

OIGA premised its refusal to contribute to the settlement of the Archers' claim on former R.C. 3955.13(A), which provided as follows:

"Any person having a covered claim upon which recovery is also presently possible under an insurance policy written by another insurer shall be required first to exhaust his rights under such other policy. Any amount payable on a covered claim under sections 3955.01 to 3955.20, inclusive, of the Revised Code shall be reduced by the amount of such recovery." (Emphasis added.)

After reviewing the applicability of R.C. 3955.13(A) to the facts of the case, the trial court agreed with OIGA's earlier determination that the statutory provision prohibited OIGA from funding any settlement. Since, at the time of settlement, all other applicable sources of insurance had not been exhausted, the trial court ruled that R.C. 3955.13(A) barred OIGA from contributing to the Archer settlement. The court of appeals held that even assuming, arguendo, that no other insurance existed within the meaning of R.C. 3955.13(A), PIE and PICO incurred no prejudice as a result of the trial court's determination. The court of appeals found that PIE and PICO either "contributed money to settle Archers' claim to protect an interest and therefore seek recovery from OIGA based upon subrogation rights, for which the statute precludes recovery, or they voluntarily assumed payments they were not legally obligated to make, for which equity provides no relief."

As previously discussed, OIGA's purpose is to prevent an insurer's insolvency from causing devastating loss to insureds or third-party claimants. The General Assembly's intent that OIGA was created for a very limited purpose is expressed in the language of R.C. Chapter 3955. In addition to the covered claim restriction of R.C. 3955.01(B), and also in keeping with its responsibility to guard against unnecessary depletion of its funds, OIGA is obligated to refuse payment where another applicable source of insurance coverage exists. Under the terms of R.C. 3955.13(A), OIGA steps in as a source of insurance coverage only when all other possible sources of insurance recovery are exhausted.

Despite Ohio law to the contrary, PIE and PICO argue that OIGA breached a duty of good faith to them by failing to pay the Archers' covered claim. Appellants charge that other insurance, within the meaning of R.C. 3955.13(A), did not exist. They maintain that since no other insurance coverage existed during the time in which PMIC provided coverage to Dr. Chila and OUOMC, OIGA (as successor to PMIC) was not entitled to rely on R.C. 3955.13(A). Appellants thereby urge this court to find that Marilyn Archer's injuries were divisible, i.e., the injuries were capable of being traced to (and, therefore, attributable to) a specific policy period. Since damages are capable of being apportioned among the separate periods of consecutive nonoverlapping medical malpractice insurance coverages, the appellants believe they are entitled to recover amounts OIGA should have contributed to the settlement.

The fallacy of appellants' argument that other insurance coverage did not exist is that divisibility of Marilyn Archer's injures has not been established due to the settlement of the underlying medical malpractice action. There has been no factual determination as to when Dr. Chila's misdiagnosis proximately resulted in the injuries complained of.4  In Pang v. Minch (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, we adopted 2 Restatement of the Law 2d, Torts (1965), Section 433B(2) in paragraph six of the syllabus, which provides as follows:

"Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actorss seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor."

Accordingly, had the defendants in the underlying negligence action (PICO, OIGA and PIE) chosen to limit their liability on the ground that the harm was capable of being apportioned among them, the defendants would bear the burden of establishing the divisibility of the harm. OIGA could be liable (and then only up to $300,000) if it were established in the underlying action that the negligent acts which led to the Archers' damages were committed exclusively during the PMIC coverage period. See R.C. 3955.01(B)(1). In the case at bar, however, PIE and PICO abandoned their rights under Pang by not litigating the apportionment of damages and instead settling the Archers' action.

In summary, although appellants may frame their action in other terms, they are actually seeking recovery through subrogation principles. R.C. 3955.01(B)(2) explicitly and unequivocally prohibits OIGA from making payments to insurers

on the basis of a subrogated law claim.  Regardless how this claim may arise, no recourse against OIGA's funds may be had.

Moreover, it can be argued that OIGA is statutorily immune from lawsuits, such as those in the instant case, where a party claims damages due to OIGA's failure to properly perform its powers and duties as stated in R.C. 3955.08.  Former R.C. 3955.18, which was enacted contemporaneously with the General Assembly's creation of OIGA in R.C. Chapter 3955, reads as follows:

"There shall be no liability on the part of and no cause of action of any nature shall arise against any member insurer, the Ohio insurance guaranty association or its agents or employees, the board of directors, or the superintendent of insurance or his representatives for any action taken by them in the performance of their powers and duties under sections 3955.01 to 3955.20, inclusive, of the Revised Code."  (Emphasis added.)

R.C. 3955.18 would therefore bar an insured or third-party claimant from holding OIGA liable for damages caused by OIGA's failure to properly identify, settle or pay a covered claim. While the insured or third-party claimant is entitled to judicial relief necessary to force OIGA to perform its statutory duties, no action seeking damages can be maintained against the association.  Accordingly, PIE and PICO (who, as insurers, are not even entitled to the protections of R.C. Chapter 3955) cannot likewise hold OIGA liable for bad-faith refusal to settle a covered claim.

For the foregoing reasons, we hold that neither PIE nor PICO can seek to recover from OIGA a pro-rata share of the settlement amount.  The judgment of the court of appeals is, therefore, affirmed.

Judgment affirmed.

A.W. Sweeney, Douglas, Resnick and F.E. Sweeney, JJ., concur.

Wright and Pfeifer, JJ., dissent.


FOOTNOTES:

1 On October 9, 1987, PMIC was declared insolvent by the state of Missouri.  Accordingly, as is required by R.C. Chapter 3955, OIGA assumed PMIC's rights, duties, and obligations. (R.C. 3955.08[A][2].)

2 We note that R.C. Chapter 3955 was amended effective October 26, 1989 (143 Ohio Laws, Part II, 2253).  The changes appear to be minor and do not relate to this case.

3 Reading R.C. 3955.03 together with R.C. 3955.01(B), it appears that the General Assembly intended for the Act to protect policyholders only if they are also insureds.

4 For instance, it is the contention of PICO that, while there may have been negligence (misdiagnosis) by Dr. Chila during the first period of coverage afforded by PICO, the malignancy had not appreciably advanced until coverage by PMIC commenced.  That is, the malignancy did not rupture the bone necessitating the resection until after PICO ceased coverage.

It is equally unsurprising that PIE maintains that Dr. Chila's failure to properly diagnose the malignant tumor during PIE's short coverage period did not proximately cause the injuries Marilyn Archer suffered.  Had Dr. Chila diagnosed the

real cause of her discomfort on the very first office visit during the PIE coverage period, PIE believes that Archer's injuries would have been no worse.