[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
{¶ 1} Plaintiff, Kentucky Medical Insurance Company ("KMIC"), and third-party defendant, Ohio Insurance Guaranty Association ("OIGA"), appeal from a judgment of the Franklin County Court of Common Pleas denying their separate motions for summary judgment and granting the summary judgment motion of defendants Therese Jones, M.D. ("Dr. Jones") and J A Imaging Co., Inc. ("J A").
 {¶ 2} From February 1, 1997 to February 1, 1998, Dr. Jones, a radiologist, and her employer, J A, were insured under a "claims-made" professional liability insurance policy issued by the P.I.E. Mutual Insurance Company ("PIE"). On August 27, 1997, defendants received a "180-day letter"[1] indicating that Ronald D. Grumbling, a former patient, was investigating a potential legal action against them resulting from defendants' allegedly negligent medical care. Defendants forwarded the letter to PIE on September 2, 1997. PIE acknowledged receipt of the letter on September 8, 1997. On December 15, 1997, the Ohio Department of Insurance placed PIE under rehabilitation.
 {¶ 3} Defendants subsequently decided to change insurance carriers and on January 10, 1998, filed an application for medical professional liability coverage with KMIC. Defendants fully disclosed on the application that they had received the 180-day letter from Mr. Grumbling. Specifically, defendants stated the following in response to a question regarding whether any claims or suits had been filed against them as a result of professional services:
 {¶ 4} "1997: Ronald D. Grumbling — 180 Day — Letter of intent to bring action. I [Dr. Jones] read 2 chest x-rays on this patient in 1996. Pt. had nodule on chest x-ray — unchanged at 4 mos. Follow up — recommended CT of chest if further work up wanted. Pt. came back 1 year later with cancer of lung. Pt. is 37 y/o."
 {¶ 5} Defendants further answered "yes" to the following question:
 {¶ 6} "Have any incidents occurred in your practice (treatment results less than anticipated, complications that prolonged treatment/hospitalization, patient expressions of dissatisfaction, fee disputes, etc.) that, from your knowledge of the patient situation, have any realistic potential of developing into a formal claim against you?" (Jan. 17, 2002 Agreed Stipulation of Facts, Exhibit C.)
 {¶ 7} Thereafter, on February 1, 1998, KMIC issued a "claims-made" policy to defendants for the period February 1, 1998 to February 1, 1999. The policy was renewed for two subsequent one-year policy periods. The policy included a "tail" provision which provided retroactive coverage for services provided by J A after February 1, 1996, and for services provided by Dr. Jones after February 1, 1990, as long as the claim met the terms of the policy.
 {¶ 8} On March 23, 1998, the Franklin County Court of Common Pleas entered an order placing PIE in liquidation. The order provided that proofs of claim regarding the PIE liquidation had to be filed no later than March 23, 1999. Defendants filed a proof of claim related to the Grumbling 180-day letter on October 30, 1998. On February 17, 1999, the court extended the deadline for filing proofs of claim in connection with the PIE liquidation. Under this order, the court set September 23, 1999, as the final bar date in the liquidation proceeding.
 {¶ 9} Mr. Grumbling died on October 5, 1998. His wife was appointed fiduciary of his estate. On June 30, 2000, Mrs. Grumbling filed a wrongful death action against defendants.
 {¶ 10} On July 7, 2000, defendants apprised KMIC of the Grumbling lawsuit. Citing the August 27, 1997 180-day letter, KMIC denied coverage on the ground that the claim was not first made against defendants during the policy period.
 {¶ 11} Defendants also sought coverage from the OIGA based upon their PIE policy. The OIGA denied coverage on the ground that defendants had not filed a proper proof of claim by the September 23, 1999 bar date.
 {¶ 12} In February 2001, KMIC filed a complaint for declaratory judgment, requesting that the court declare the rights and responsibilities of the parties with respect to the KMIC policy. Defendants filed a counterclaim against KMIC and a third-party complaint against OIGA requesting a declaration that either KMIC or OIGA were obligated to insure, indemnify and defend them in the Grumbling wrongful death action.
 {¶ 13} All parties filed motions for summary judgment. The trial court granted defendants' motion and denied those of KMIC and OIGA. In particular, the court determined that KMIC has a duty to indemnify and defend defendants in the Grumbling wrongful death lawsuit. The court further determined that OIGA has a duty to provide coverage to defendants in the Grumbling lawsuit, but only after the policy limits under the KMIC lawsuit are fully exhausted.
 {¶ 14} KMIC has filed a timely appeal, asserting the following three assignments of error:
 {¶ 15} "[I.] The Trial Court erred in granting Defendants' Motions for Summary Judgment and holding that Kentucky Medical Insurance Company has a duty to indemnify and defend Defendants Dr. Therese Jones, M.D. and J A Imaging, Inc. with respect to the claims advanced in a lawsuit filed against them, captioned Diana Grumbling, Admin. et al v. Therese Jones, MD, et al., Case No. CV00060192, filed June 30, 2000 in the Logan County Court of Common Pleas.
 {¶ 16} "[II.] The Trial Court erred in denying Plaintiff's Motion for Summary Judgment and failing to declare that Kentucky Medical Insurance Company owes no duty to Defendants Dr. Therese Jones, M.D. and J A Imaging, Inc. with respect to the claims advanced in a lawsuit filed against them, captioned Diana Grumbling, Admin., et al v. Therese Jones, MD, et al., Case No. CV00060192, filed June 30, 2000 in the Logan County Court of Common Pleas.
 {¶ 17} "[III.] The Trial Court erred in its determination that Third-Party Defendant Ohio Insurance Guaranty Association must provide coverage only in the event that the policy limits under the Kentucky Medical Insurance Company policy are first fully exhausted."
 {¶ 18} In addition, OIGA has filed a timely cross-appeal, advancing a single assignment of error, as follows:
 {¶ 19} "The trial court erred when it held that a claimant under an insurance policy issued by an insolvent insurer has a valid claim against the Ohio Insurance Guaranty Association, pursuant to R.C.3955.08(A), even though the claimant filed only a contingent claim and did not meet the deadline set by the liquidating court for filing an actual claim."
 {¶ 20} Initially, we note that an appellate court reviews a trial court's ruling on a motion for summary judgment independently and without deference to the trial court's determination. Brown v. Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711. In reviewing a trial court's disposition of a summary judgment motion, an appellate court applies the same standard as that of the trial court. Maust v. Bank One Columbus, N.A. (1992), 83 Ohio App.3d 103, 107. Before summary judgment can be granted under Civ R. 56(C), the trial court must determine that:
 {¶ 21} "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a mater of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. * * *" State ex rel. Parsons v. Fleming (1994), 68 Ohio St.3d 509, 511, citing Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327.
 {¶ 22} KMIC's first and second assignments of error are interrelated and, thus, will be considered jointly. KMIC contends that the trial court erred in determining that it has a duty to indemnify and/or defend defendants against the wrongful death claim brought against them because that claim was first made against defendants and reported by them prior to the effective date of the policy and, therefore, is excluded under the terms of the policy. In particular, KMIC contends that the claim against defendants was first made when they received the 180-day letter from Mr. Grumbling on August 27, 1997, notifying them of a potential lawsuit in connection with defendants' alleged medical malpractice. According to KMIC, because defendants were first notified of a potential legal action against them prior to February 1, 1998, the effective date of the policy, any cause of action by any party (including a wrongful death action brought on behalf of the state), arising from the treatment that was the subject of that investigation is excluded from coverage under the terms of the policy. Defendants maintain that because the window on the medical malpractice claim asserted by Mr. Grumbling in the 180-day letter closed on February 27, 1998, by virtue of the statute of limitations and because the wrongful death action did not accrue until after Mr. Grumbling's death in October 1998, the wrongful death action constitutes a separate claim under the policy. Defendants further contend that since they received notice of that claim and reported it to KMIC during the policy period, KMIC was obligated to indemnify and/or defend them.
 {¶ 23} An insurance carrier may maintain a declaratory judgment action to determine its rights and obligations under an insurance contract. Cincinnati Indemn. Co. v. Martin (1999), 85 Ohio St.3d 604,605. The obligation of a liability insurer to its insured arises only if the claim falls within the scope of coverage. Id. The insurer need not defend a claim if there is no set of facts alleged in the complaint which, if proven true, would invoke coverage. Id. Accordingly, if it is established that the claim falls within an exclusion to coverage, the insurer is not obligated to defend the insured. Id.
 {¶ 24} In determining whether KMIC has a duty to indemnify and/or defend its insureds, Dr. Jones and J A, against the wrongful death claim brought against them, we first look at the language of the insurance contract itself.
 {¶ 25} As this court stated in Dixon v. Professional Staff Mgmt., Franklin App. No. 01AP-1332, 2002-Ohio-4493, at ¶ 26:
 {¶ 26} "The interpretation of an insurance contract involves a question of law. Leber v. Smith (1994), 70 Ohio St.3d 548, 553. * * * `The fundamental goal in insurance policy interpretation is to ascertain the intent of the parties from a reading of the contract in its entirety, and to settle upon a reasonable interpretation of any disputed terms in a manner calculated to give the agreement its intended effect.' Burris v. Grange Mut. Cos. (1989), 46 Ohio St.3d 84, 89. * * * When the language used is clear and unambiguous, a court must enforce the contract as written, giving words used in the contract their plain and ordinary meaning. Cincinnati Indemn. Co. v. Martin (1999), 85 Ohio St.3d 604,605, at 607. A policy is not to be read as to extend coverage to absurd lengths or to be inconsistent with logic or the law. Lovewell v. Physicians Ins. Co. of Ohio (1997), 79 Ohio St.3d 143, 148."
 {¶ 27} Further, if a court determines that the contract terms are ambiguous, the court must construe the terms in favor of the insured. Asp v. Ohio Med. Transp., Inc. (June 28, 2001), Franklin App. No. 00AP-958.
 {¶ 28} The medical professional liability policy issued by KMIC to defendants provides, in pertinent part:
 {¶ 29} "Medical Professional Liability Policy
 {¶ 30} "* * * This policy is known as a `claims made' policy. Except to the extent provided below, coverage is limited to claims arising from the performance of medical professional services subsequent to the retroactive date shown on your declarations page, first made against you while this policy is in force and first reported to the Company while the policy is in force.
 {¶ 31} "* * *
 {¶ 32} "I. Who's covered under this policy
 {¶ 33} "* * *
 {¶ 34} "Coverage A — Individual Medical Professional Liability. * * * Under Coverage A, we will defend and pay damages for claims against the insured made during the term of the policy based upon medical professional services rendered or which should have been rendered by you or by any other person (other than a physician or dentist) for whose acts or omissions you are held legally responsible in the practice of your medical profession.
 {¶ 35} "* * *
 {¶ 36} "Coverage B — Partnership, Corporation or other Entity Medical Professional Liability (organizational coverage). * * * Under this coverage, we will defend and pay damages for claims against the insured made during the term of this policy based upon medical professional services rendered, or which should have been rendered by a person for whose acts or omissions the partnership, corporation or medical professional association shown as an insured on the declarations page is legally responsible.
 {¶ 37} "II. Where you are covered
 {¶ 38} "This insurance applies to claims arising out of medical professional services rendered, or which should have been rendered, anywhere in the world, provided that any suit arising from the services rendered or which should have been rendered must be brought within the United States of America, its territories or possessions.
 {¶ 39} "III. What this policy covers
 {¶ 40} "Individual coverage. As stated above, your medical professional liability policy covers you under Coverage A for claims for damages resulting from your rendering or failure to render medical professional services to patients. * * *
 {¶ 41} "* * *
 {¶ 42} "Organizational coverage. Under Coverage B, if your organization is listed as an insured under this policy, we will cover it for claims for damages resulting from providing or failure to provide medical professional services to patients by anyone for whose acts it is legally responsible. * * *
 {¶ 43} "IV. When you are covered
 {¶ 44} "Requirements. A claim must meet three requirements to be covered under this policy:
 {¶ 45} "a) the claim must result from medical professional services provided or withheld on or after the retroactive date shown on the declarations page;
 {¶ 46} "b) the claim must be made against you and reported to us for the first time during the policy period; and
 {¶ 47} "c) the claim must be covered according to all other terms, conditions, exclusions, waivers, exceptions, declarations and endorsements found in or attached to this policy.
 {¶ 48} "`Policy period' as used in this agreement means the time between your inception and expiration dates as shown on the declarations page * * *.
 {¶ 49} "Claims made against you prior to the effective date shown on the declarations page of your policy and claims based upon services rendered or withheld prior to your retroactive date are not covered. * * *
 {¶ 50} "Your retroactive date. Your retroactive date is the earliest date for which a claim may be covered as shown on the declarations page of the policy. * * *
 {¶ 51} "* * *
 {¶ 52} "VI. What is a `claim'
 {¶ 53} "If reported to the Company during the policy period, the following shall be a claim as the term applies to this policy:
 {¶ 54} "(a) the receipt by you of a notice of legal action for damages based upon medical professional services rendered or which should have been rendered; or
 {¶ 55} "(b) the receipt by you of express notification of an intention to investigate a potential legal action against you or of an intention to hold you responsible for damages.
 {¶ 56} "* * *
 {¶ 57} "VII. When a claim is made
 {¶ 58} "A claim is considered to be made on the first date you receive notice of a legal action against you or the date of your receipt of express notification of an intention to investigate a potential legal action against you or to hold you responsible for damages. * * *" (Agreed Stipulation of Facts, Exhibit D.)
 {¶ 59} There are two basic types of professional liability insurances policies — "claims made," and "occurrence." In United States v. Strip (C.A.6, 1989), 868 F.2d 181, the court discussed the differences between these two policy types:
 {¶ 60} "* * * A claims made policy provides coverage for claims brought against the insured only during the life of the policy. An occurrence policy provides coverage for acts done during the policy period regardless of when the claim is brought. * * *" Id. at 184.
 {¶ 61} The court further stated:
 {¶ 62} "* * * Claims made policies, unlike occurrence policies, are designed to limit liability to a fixed period of time. To allow coverage beyond that period would be to grant the insured more coverage than he bargained for and paid for, and to require the insurer to provide coverage for risks not assumed." Id. at 187. See, also, Asp, supra, quoting Checkrite Ltd., Inc. v. Illinois Natl. Ins. Co. (S.D.N.Y. 2000),95 F. Supp.2d 180, 191-192. ("The existence of a cut-off date is integral to a claims-made policy, as it is `a distinct characteristic of such a policy that directly relates to rate setting.' ")
 {¶ 63} It is undisputed that the KMIC policy at issue is a "claims made" policy. It is further undisputed that the medical services provided by defendants to Mr. Grumbling did not pre-date the retroactive date of the policy. It is also undisputed that the 180-day letter received by defendants on August 27, 1997, constituted a "claim" as defined in the policy. It is further undisputed that defendants received notice of the wrongful death action and reported it to KMIC during the term of the KMIC policy. What is disputed, however, is whether defendants' receipt and reporting of the notice of the wrongful death lawsuit constitutes a separate "claim" under the terms of the KMIC policy, or whether the wrongful death action is subsumed in the "claim" reported to PIE.
 {¶ 64} The trial court determined that defendants substantially complied with the terms of the KMIC policy when they reported on the insurance application that they had received a 180-day letter regarding the treatment of Mr. Grumbling and when they reported the receipt of the wrongful death action brought by Mr. Grumbling's estate. In so finding, the trial court found particularly that the policy did not state that coverage applied only to claims that are "first made against you while this policy is in force, and first-reported to the company while your policy is in force." (Jan. 31, 2002 Decision, at 9.)
 {¶ 65} After a thorough and careful reading of the language contained in the KMIC policy, we conclude that the trial court erred in concluding that KMIC is obligated to indemnify and/or defend defendants in the wrongful death action filed against them.
 {¶ 66} In the parties' agreed stipulation of facts, defendants admit that a claim for medical malpractice arose with the August 27, 1997 180-day letter and that that claim is not covered under the KMIC policy because it was made before the effective date of the policy. However, defendants assert in their summary judgment motion that a second claim developed when Mrs. Grumbling filed the wrongful death action, even though that action arose out of the same facts and circumstances underlying the medical malpractice claim asserted in the 180-day letter.
 {¶ 67} In support of this contention, defendants contend that the word "or" in Section VI of the policy means that causes of action related to and arising from the same incident of malpractice can be considered multiple claims. Specifically, defendants contend that the word "or" in the definition of "claim" means that a "claim" is either the receipt by defendants of the wrongful death lawsuit or the receipt by defendants of the 180-day letter. According to defendants, either event constitutes a "claim," so long as it is reported to KMIC during the policy period. We do not agree with this interpretation of the policy language, particularly when read in conjunction with other policy language. Defendants' interpretation reads the word "first," contained in Sections IV and VII, out of the policy. Those sections state, respectively, that for a claim to be viable under the KMIC policy, it must "first" be made and reported during the KMIC policy period, and that a claim is considered to be made on the "first date" defendants received notice of a legal action or of an intention to investigate a potential legal action. We believe that use of the word "or" in the definition of "claim" under Section VI means that defendants could have first received notice of a claim against them via either receipt of notice of a legal action against them or receipt of express notification of an intention to investigate a potential legal action against them. In this case, defendants "first" received notice of a "claim" involving their professional care of Mr. Grumbling via the 180-day letter.
 {¶ 68} This interpretation necessarily rejects a further contention of defendants, i.e., that the language contained in Section VII which states that the date that a claim is considered to be "first" made applies only to notice of legal action and not to a notification of an intention to investigate a potential legal action. Again, we do not accept defendants' interpretation of the use of the word "or." A court interpreting a clause in an insurance policy must give the entire clause its usual and ordinary meaning consistent with the grammar utilized. See, e.g., The Midwestern Indemn. Co. v. Patrick (Jan. 19, 1997), Putman App. No. 12-96-06. Where a comma is used in a sentence or paragraph, it may serve to separate clauses. However, when no comma is used, the clause is not be partitioned into two separate clauses and should be read as a whole, consistent with the usage of grammar and ordinary meaning. Id. (holding that language in an insurance policy excluding "bodily injury or property damage resulting from the ownership, maintenance or use of a vehicle, other than your insured car, which is owned by or furnished or available for regular use by you or a relative" contains three separate clauses, separated by commas, but may not be further subdivided to separate the words "furnished or available for regular use" from the work "relative" simply due to the presence of the word "or").
 {¶ 69} Applying these same principles to the language utilized in Section VII, we find that the word "first" modifies both the date an insured receives notice of a legal action and the date of the insured's receipt of notification to investigate a potential legal action for damages.
 {¶ 70} Further, contrary to defendants' assertion that the wrongful death action constitutes a separate claim, we note that nowhere in the policy is the term claim defined as a cause of action, and its definition does not turn on when a separate cause of action first accrues. Rather, the policy provides that a claim includes, inter alia, "the receipt by you of express notification of an intention to investigate a potential legal action against you or of an intention to hold you responsible for damages." The policy does not limit the type of damages for which the insured may be potentially responsible in the future as a result of a particular act of medical malpractice. Instead, under Section III, the policy states that it covers defendants "* * * for damages resulting from your rendering or failure to render medical professional services to patients." (Emphasis added). Under the terms of the policy, the receipt of a notification of a potential action relating to defendants' rendering of professional medical services includes all potential damages that could result from the malpractice, and certainly would encompass complications resulting in the patient's death.
 {¶ 71} As noted previously, the policy also provides that a claim is made upon the first date that the insured receives notification of an intention to investigate a potential legal action or to hold the insured responsible for future damages resulting from an act of medical malpractice. Contrary to defendants' assertion, the policy does not state that a claim is made on the date that a cause of action for additional damages may later accrue as a result of the medical malpractice. The fact that a cause of action may accrue at a later date does not alter the fact that prior to the inception of the KMIC policy period, the insured received an express notification of an alleged act of medical malpractice which would be investigated and could lead to potential future damages. These damages would include any amounts payable upon Mr. Grumbling's death, if defendants' malpractice should cause that death.
 {¶ 72} In the KMIC insurance application, defendants admitted that the alleged medical malpractice had been reported as a claim to PIE and was being investigated. Defendants also informed KMIC that the claim had a "realistic potential of developing into a formal claim" against them. Such "formal claim" would certainly include the development of a formal claim for wrongful death should Mr. Grumbling die in the future.
 {¶ 73} While we are well aware that Ohio case law instructs that a wrongful death action constitutes a separate, independent cause of action from an action for medical malpractice, we note that the cases cited by defendants for that proposition did not involve insurance coverage of a wrongful death claim. These cases did not address whether such a claim is truly "separate" from the act of malpractice for insurance purposes.
 {¶ 74} The parties have not cited, nor has our research uncovered, any cases that directly involve the precise issue raised herein. However, we note two cases that are instructive on the subject.
 {¶ 75} In Cincinnati Indemn., supra, a father, as administrator of his son's estate, filed a wrongful death action against his ex-wife after the couple's son accidentally shot their other son. The father sought insurance coverage under the ex-wife's homeowner's liability policy. The insurer filed a declaratory judgment action, seeking a declaration as to whether it was required to defend and indemnify the ex-wife against the father's wrongful death claim. The trial court granted summary judgment for the insurer because the policy excluded "bodily injury," which was defined as "bodily harm, sickness, or disease," including "required care, services and death resulting from bodily injury." The father contended, however, that the exclusion did not apply because he personally did not suffer any bodily injury, and as a wrongful death claimant, he had a distinct claim for wrongful death separate from the decedent's bodily injury. Both the court of appeals and the Ohio Supreme Court affirmed summary judgment for the insurer, rejecting the proposition that the wrongful death claim was a separate and distinct claim. The court held:
 {¶ 76} "By focusing on his independent right to bring a wrongful death claim, and in ignoring the plain language of the policy, which excludes liability coverage for bodily injury to an insured, including claims resulting from his death, [the plaintiff] has lost sight of the relevant issue at hand, i.e., whether there is policy coverage that would trigger [the insured's] duty to indemnity and/or defend the insured in the wrongful death lawsuit. Even though [the plaintiff] may pursue an independent wrongful death claim (Thompson v. King [1994],70 Ohio St.3d 176, 637 N.E.2d 917), this does not mean that he can create liability coverage where there is none. Thus, we hold that an insurer has no duty to defend or indemnify its insured in a wrongful death lawsuit brought by a noninsured based on the death of an insured where the policy excludes liability coverage for claims based on bodily injury to an insured. Since [the plaintiff's] wrongful death claim stems solely from an insured's `bodily injury,' we hold that [the plaintiff's] wrongful death claim is excluded from coverage and that [the insurer] has no duty to defend or indemnify its insured." Id. at 608-609.
 {¶ 77} Although a wrongful death claim may be distinct as a legal cause of action, such claim nonetheless is "`originating in the same wrongful act or neglect.'" Kohler v. St. Joseph Hosp. (1982),69 Ohio St.2d 477, 479, quoting Klema v. St. Elizabeth's Hosp. (1960),170 Ohio St. 519, 521. Under the KMIC policy, coverage is provided for damages "arising out of" and "resulting from" the insureds' rendering or failure to render medical professional services to patients, and claims for such coverage must be first made against the insured and reported to KMIC during the KMIC policy period. Just like the father in Cincinnati Indemn., defendants incorrectly rely on Thompson, supra, for the proposition that a separate claim for wrongful death was made by defendants for insurance purposes. The Ohio Supreme Court rejected the same argument. While a separate wrongful death cause of action may exist as a general proposition, a separate wrongful death claim does not exist for insurance purposes because that claim stems solely from the medical malpractice about which defendants were first notified prior to the inception of the KMIC policy.
 {¶ 78} Finally, even if, as defendants contend, the window closed on Mr. Grumbling's medical malpractice claim by virtue of the statute of limitations, that event did not change the KMIC policy definitions of claim or when a claim was first made. As in Cincinnati Indemn., all "damages" payable for wrongful death would still have stemmed solely from, arisen out of, or resulted from the malpractice that was the subject of the 1997 180-day letter. Even though a window may have opened for a wrongful death action in 1998, defendants nevertheless received express notification in the 180-day letter of an investigation of a potential future legal action or intention to hold them responsible for future damages. The KMIC policy expressly provides that "claims made prior to the effective date shown on the declarations page of your policy * * * are not covered."
 {¶ 79} In addition to Cincinnati Indemn., we find the case of Thomson v. Ohio Ins. Co., 150 Ohio App.3d 352, 2002-Ohio-6517, helpful. In that case, the patient, Mr. Watkins, filed a medical malpractice action and his wife and son brought loss of consortium claims against Mr. Watkins' physician and employer. The physician and employer were covered by a claims-made professional liability insurance policy. Pursuant to a declaratory judgment action filed by the insurer, the trial court declared that the policy would not provide new limits of coverage for any wrongful death action brought by the wife and son if Mr. Watkins died as a result of his injuries during a yearly policy period subsequent to the one in which he made his medical malpractice claim. The Watkinses appealed that ruling, contending that when a claim for bodily injury and a claim for wrongful death arise during separate policy periods under a professional liability claims-made policy, separate liability limits should be held to apply during each claims-made policy period, even when the claims arise from the same act of alleged medical malpractice. The appellate court rejected that argument on the ground that it was not supported by the specific terms of the policy. The policy stated that the insurer considered a "claim" to be first made at the earlier of two events — when the insured first gives the insurer written notice that a claim has been made, or when the insured first gives the insurer written notice of incidents or circumstances which may result in a claim. In rejecting the Watkinses' contention, the appellate court adopted the rationale set forth by the trial court:
 {¶ 80} "`The policy is rather specific. It only covers claims for professional negligence that are made during the policy year in which the insured first gave written notice of incidents or circumstances which may result in a claim. This notice was given by the Watkinses in the policy year April 1, 2000 to April 1, 2001 and the limits of coverage applicable to that policy year control the extent of the liability of the defendant for all claims made during that year. This would include any claim made for a death which occurs in a * * * policy year [subsequent to the policy year in which] the claim was first made.' * * *" Id. at 359. (Emphasis sic.)
 {¶ 81} Although the issue decided in Thomson is not the precise issue presented in the instant case, we find the rationale employed therein applicable to the circumstances herein. Following Thomson, because the medical malpractice claim in the instant case was first made against defendants and reported to PIE, it is that policy that would provide coverage for a wrongful death claim which occurred during a policy period subsequent to the policy period in which the claim was first made. Accordingly, there are not two separate claims under two different policy periods (and in this case, two different policies) resulting from the subsequent death of Mr. Grumbling arising out of the medical malpractice that was the subject of the medical malpractice claim.
 {¶ 82} Based upon the above analysis, we find that no coverage is available through the KMIC policy to defendants for the medical malpractice damages related to their treatment of Mr. Grumbling, including the wrongful death action asserted by his estate. A "claim" was made prior to the inception of the KMIC policy when "an express notification was received by [the insureds] which stated an intention to investigate a potential legal action against [them] or of an intention to hold [them] responsible for damages." These "damages" would include wrongful death damages because they "stem solely" from the malpractice which was previously reported to PIE prior to the inception of the KMIC policy. The "claim" was not first reported during the KMIC policy period as required, and the policy excludes any such claims made prior to the effective date of the policy. Thus, we find that the trial court erred in holding that KMIC was obligated to indemnify and/or defend defendants in the wrongful death action filed on behalf of Mr. Grumbling's estate. Accordingly, KMIC's first and second assignments of error are sustained.
 {¶ 83} KMIC's third assignment of error is conditioned upon a finding by this court that KMIC is obligated to indemnify and/or defend defendants against the wrongful death action filed against them. Having found that KMIC is not so obligated, the third assignment of error is moot. See App.R. 12(A)(1)(c).
 {¶ 84} Turning to OIGA's cross-appeal, we note initially that OIGA does not argue that defendants do not have a valid claim against the OIGA because the PIE policy provides no coverage for defendants' claims. Rather, OIGA contends only that defendants do not have a valid claim against the OIGA because defendants failed to meet the deadline set by the liquidating court for filing a valid claim.
 {¶ 85} As noted previously, PIE was placed into rehabilitation by the Ohio Department of Insurance on December 15, 1997. On March 28, 1998, the Franklin County Court of Common Pleas entered an order placing PIE into liquidation and specifying that no claims against PIE would be recognized unless they were filed by March 23, 1999. On October 30, 1998, defendants filed a proof of claim asserting a claim in regard to the 180-day letter filed by Mr. Grumbling and stating that the claim had not yet been filed in court. On February 17, 1999, the court extended the absolute bar date for filing claims against PIE to September 23, 1999. The order provided that "All Contingent Claims and all Future Claims, as defined in the Notice, will be forever barred and foreclosed after September 23, 1999." The order further stated that "any and all Proofs of Claim received by the Liquidator (1) after September 23, 1999 or (2) on or before September 23, 1999, which do not contain sufficient supporting information to evidence that the claim is not a Contingent Claim or a Future Claim" would "forever be barred and foreclosed." The notice to which the order referred stated:
 {¶ 86} "`Contingent Claims' are claims which have not yet fully developed and ripened into actual, litigated claims. A claim is a Contingent Claim unless an actual lawsuit has been filed as to the claim or unless the claimant has made a formal written demand for payment on the claim * * *[.]"
 {¶ 87} "* * *
 {¶ 88} "* * * If you have already filed a proof of claim for a Contingent Claim or a Future Claim, you must submit evidence that an actual claim exists no later than September 23, 1999, or your claim will be barred and foreclosed." (Agreed Stipulation of Facts, Exhibit F.)
 {¶ 89} Pursuant to the liquidating court's February 17, 1999 order, defendants' October 30, 1998 proof of claim set forth only a "contingent claim" as defined therein, as defendants did not indicate that an actual lawsuit had been filed or that a formal written demand for payment had been made. Under the terms of the court's order, this "contingent claim" would be forever barred unless defendants submitted evidence that an actual claim existed before the absolute bar date of September 23, 1999. Defendants did not comply with that deadline because no suit was filed against defendants until June 30, 2000.
 {¶ 90} OIGA moved for summary judgment on the ground that defendants failed to file an actual claim against PIE before the September 23, 1999 deadline and, thus, were barred from any recovery against OIGA pursuant to R.C. 3955.08(A). The trial court held that defendants gave proper notice of their proof of claim pursuant to the liquidating court's March 28, 1998 order because they filed a proof of claim prior to March 23, 1999, the deadline set by the March 28, 1998 order. The trial court later denied OIGA's motion for reconsideration of this issue, holding that the definition of "actual claim" contained in the liquidating court's February 17, 1999 order should not be used to determine whether defendants had filed a valid claim. Rather, the trial court concluded that defendants filed a "covered claim," as that term is defined in R.C. 3955.01(D), within the scope of coverage of their PIE professional liability insurance policy and that it would be "unconscionable" to enforce the liquidating court's order because the liquidating court's March 28, 1998 order did not differentiate between "claim," "contingent claim," and "future claim."
 {¶ 91} Because OIGA is prohibited by statute from making payments on behalf of an insolvent insurer for claims that were not filed prior to the final date set by the liquidating court for filing claims against the insolvent insurer, we find that the trial court erred as a matter of law in holding that defendants filed a timely claim in the PIE liquidation proceedings and that the liquidating court's order should be ignored because it is "unconscionable."
 {¶ 92} "The Ohio Insurance Guaranty Association Act, R.C. Chapter 3955, was designed to protect insureds and third-party claimants from a potentially catastrophic loss due to the insolvency of a member insurer. To this end, OIGA assumes the place of the insolvent insurance carrier for liability purposes only and provides insurance coverage when no other insurance is available to compensate valid claims." PIE Mut. Ins. Co. v. Ohio Ins. Guar. Assn. (1993), 66 Ohio St.3d 209, paragraph one of the syllabus.
 {¶ 93} The OIGA is the statutory mechanism created by the General Assembly for, among other things, the payment of covered claims under certain insurance policies. R.C. 3955.03. Thus, when an insurer becomes insolvent, the OIGA assumes all of the insurer's obligations to the insured and to third-party claimants. R.C. 3955.08(A)(2) and (4); Lake Hosp. Sys., Inc. v. Ohio Ins. Guar. Assn. (1994), 69 Ohio St.3d 521,523. Under the Act, OIGA is vested with responsibility for providing insurance coverage when no other insurance is available to compensate valid claims. R.C. 3955.13(A). However, under the terms of the Act, not all claims covered by the insolvent carrier's policy are payable by OIGA. Id.
 {¶ 94} For example, the General Assembly has prohibited payment by OIGA to a claimant who fails to file a claim against the insolvent insurer before the final date set by the court in the liquidation proceedings. R.C. 3955.08(A)(1) provides:
 {¶ 95} "The Ohio insurance guaranty association shall:
 {¶ 96} "(1) Be obligated to the extent of the covered claims existing prior to the determination that an insolvent insurer exists and arising within thirty days after such determination, or before the policy expiration date if less than thirty days after the determination, or before the insured replaces the policy or on request effects cancellation, if he does so within thirty days after the determination. * * * Notwithstanding any other provision of the Revised Code, [OIGA] shall not be liable to pay any claim filed with [OIGA] after the earlier of the final date set by a court for filing claims in the liquidation proceedings of the insolvent insurer or eighteen months after the order of liquidation."
 {¶ 97} In the instant case, the absolute bar date set by the liquidating court for filing claims in the PIE liquidation proceedings was September 23, 1999, exactly 18 months after the original order of liquidation.
 {¶ 98} In Lake Hosp., supra, the Ohio Supreme Court held that "[t]he language of R.C. 3955.08(A) is mandatory and does not provide for any discretion on the part of the Ohio Insurance Guaranty Association to entertain claims that have been filed after the final date set for filing claims in a liquidation proceeding." Id. at syllabus. In so holding, the court determined that R.C. 3955.08(A) "is subject to only one possible interpretation." Id. at 525. The court "acknowledged the importance of placing reasonable limits of [OIGA's] liability" and held: "* * * Once the liquidating court establishes a definitive bar date, OIGA becomes statutorily obligated to observe the finality of that date. Were we to hold otherwise, the specific filing deadline set forth in R.C. 3955.08
would be rendered meaningless." Id. The court further stated: "* * * There must be some degree of finality to the liquidation proceedings. The allowance of delinquent claims would unnecessarily prolong distribution of the insolvent insurer's assets to the detriment of other claimants and the guaranty association. * * *" Id. at 526.
 {¶ 99} In Lorain Cty. Bd. of Commrs. v. United States Fire Ins. Co. (1992), 81 Ohio App.3d 263, the court stated:
 {¶ 100} "* * * When OIGA assumes the obligations contained in [an insolvent insurer's] policy, it is subrogated to the rights of the insured. OIGA may then seek reimbursement against the assets of the insolvent insurer in the liquidation proceedings. R.C. 3955.12.
 {¶ 101} "By limiting the period in which claims may be submitted to OIGA to the period during which the liquidation proceedings are still open, the General Assembly has evidently intended to exclude those insureds whose rights to participate in the liquidation have lapsed. * * *" Id. at 268.
 {¶ 102} In the instant case, defendants did not comply with the filing deadline set by the liquidating court in the PIE liquidation proceeding. Although they filed a proof of claim prior to the deadline, that proof of claim did not indicate that a lawsuit had been filed or that a written demand for payment had been made. In its February 17, 1999 order, the liquidating court specifically notified all PIE policyholders who had previously filed proofs of claim in which no lawsuit had been filed and no formal written demand for payment had been made that those claims were only contingent and would be barred unless necessary documentation showing they had become actual claims was filed by September 23, 1999. Defendants were on notice that their contingent claim would be barred unless they filed a proof of claim demonstrating that it had ripened into an actual claim by the deadline set by the liquidating court. They did not do so. As a result of their failure to assert an actual claim against PIE in the liquidation proceedings, they acquired no rights to distributions from PIE's assets that could be asserted by OIGA through subrogation proceedings pursuant to R.C. 3955.12(A).
 {¶ 103} The trial court determined that it would be "unconscionable" to enforce the deadline set by the liquidating court. The trial court reasoned that the liquidating court's definition of a "claim" — which determined whether an alleged obligation of PIE would be recognized in the liquidation proceedings or barred as contingent — should not be used to determine whether OIGA is obligated to pay defendants on behalf of PIE. Rather, the trial court relied upon the definition of "covered claim" set forth in R.C.3955.01(D)(1), which provides that:
 {¶ 104} "`Covered claim' means an unpaid claim, including one for unearned premiums, which arises out of and is within the coverage of an insurance policy to which sections 3955.01 to 3955.19 of the Revised Code apply, when issued by an insurer which becomes an insolvent insurer on or after September 4, 1970, and * * *
 {¶ 105} "A. The claimant or insured is a resident of this state at the time of the insured event, provided that for the purpose of determining the place of residence of a claimant or insured that is an entity other than a natural person, the state in which its principal place of business is located at the time of the insured event shall be considered the residence of such claimant or insured."
 {¶ 106} The trial court determined that defendants' claim as asserted in the October 30, 1998 proof of claim met this definition because it was an unpaid claim within the coverage of an insurance policy to which R.C. 3955.01 to 3955.19 applied and because PIE became insolvent after September 4, 1970, and defendants were residents of Ohio at the time of the incident involving Mr. Grumbling. The trial court also determined that because this "covered claim" arose prior to the determination regarding PIE's insolvency, the OIGA was obligated for it pursuant to R.C. 3955.08(A)(1).
 {¶ 107} While we agree with the trial court's finding that defendants' claim is a "covered claim" under the definition of R.C.3955.01(D), we do not agree that OIGA is obligated to pay defendants simply on the basis that the claim is a "covered claim." R.C. 3955.08(A)(1) expressly prohibits OIGA from paying claims that are barred by the liquidating court's deadline, "notwithstanding any other provision of the Revised Code." The liquidating court's February 17, 1999 order specifically stated that contingent claims would be barred unless supporting documentation showing they had become actual claims was filed by September 23, 1999.
 {¶ 108} We further do not agree with the trial court's determination that the deadline set in the liquidating court's February 17, 1999 order could be ignored because it would be unconscionable to enforce. The trial court could not circumvent R.C. 3955.08(A) by invoking the equitable doctrine of unconscionability. As the court stated in Lake Hosp., supra: "* * * OIGA, as a creature of statute, must comply with the clear provisions of the Act that define its powers and duties. This court cannot employ equitable principles to circumvent valid legislative enactments." Id. at 526. See, also, Lorain Cty. Bd. of Commrs., supra, at 269-270. ("* * * R.C. 3955.08(A)(1) sets forth a flat declaration that OIGA `shall not be liable' for late claims. This decree is neither optional nor conditional. No court may employ equitable principles * * * to circumvent legislative enactments.* * *")
 {¶ 109} In short, while the result appears harsh, defendants did not file an actual claim before the deadline set by the liquidating court, and their failure to comply with R.C. 3955.08(A)(1) cannot now be excused on equitable grounds. Accordingly, the trial court erred as a matter of law in holding that defendants filed a timely claim against OIGA. OIGA's cross-assignment of error is sustained.
 {¶ 110} For the foregoing reasons, Kentucky Medical Insurance Company's first and second assignments of error are sustained and its third assignment of error is moot. In addition, Ohio Insurance Guaranty Association's cross-assignment of error is sustained. Accordingly, the judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court for further proceedings in accordance with law and consistent with this opinion.
Judgment reversed and cause remanded.
BROWN and McCORMAC, JJ., concur.
McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] Pursuant to former R.C. 2305.11(B)(1), the one-year statute of limitations for bringing a medical malpractice action may be extended by 180 days by providing to the potential defendant "written notice that the claimant is considering bringing an action upon that claim * * *."