858 A.2d 39 (2004)
372 N.J.Super. 284
HUDSON ENVIRONMENTAL SERVICES, INC., Plaintiff,
v.
NEW JERSEY PROPERTY-LIABILITY INSURANCE GUARANTY ASSOCIATION, Defendant.
Superior Court of New Jersey, Law Division, Mercer County.
Decided April 30, 2004.
*40 Francis J. Brennan, III, Cranbury, for plaintiff.
Mark Tallmadge, New York City, for defendant (Bressler, Amery & Ross, attorneys).
OSTRER, J.S.C.

INTRODUCTION
These cross-motions for summary judgment present the novel issue whether the New Jersey Property-Liability Insurance Guaranty Association ("PLIGA") enjoys immunity from causes of action alleging that it acted in bad faith in processing and/or paying insurance claims under an insolvent insurer's policies. As the court explained after oral argument, but for reasons *41 more fully stated herein, the court concludes that PLIGA is immune, based on the plain language of the PLIGA statute's immunity provision, N.J.S.A. 17:30A-17, related provisions of the statute, and PLIGA's circumscribed mission to provide limited relief to policyholders of insolvent property and casualty insurers. Persuasive authority in other jurisdictions bolsters the court's conclusion. The court therefore grants partial summary judgment to PLIGA, dismissing with prejudice plaintiff's bad faith claims, and denies plaintiff's cross-motion.

FACTS
There is no genuine dispute about the following facts:

The Reliance Coverage.
Plaintiff Hudson Environmental Services, Inc. ("Hudson"), an environmental remediation firm, paid $52,173.32 for an environmental cost-cap insurance policy with Reliance National Insurance Company ("Reliance"). Among other things, Hudson's insurance was designed to protect it against the risk that the environmental cleanups that Hudson undertook on behalf of others would be more expensive than anticipated. The claims-made policy's term ran from November 24, 1998, to November 24, 2003.
The policy provided, among other coverages, $750,000 of "Remediation Stop Loss" coverage with a self-insured retention ("SIR") of $275,000. Thus, plaintiff was responsible for the first $275,000 of extra remediation expenses that it incurred under the "covered scope of work" during the policy period. Reliance was then responsible for all costs exceeding the SIR, up to the policy's limits. The policy's scope of work covered removing and closing various underground storage tanks and other related activities, such as soil removal and groundwater monitoring.

Hudson's Loss
Hudson's insured losses arise out of its cleanup of a gas station property in Alpine, New Jersey. For many years, Mr. and Mrs. Philip Gianuzzi leased to Shell Oil Company property they owned in Alpine at the intersection of Closter-Dock Road and Church Street. From about 1982 to 1998, the Gianuzzis leased the property to Ride Properties Inc. ("Ride"), which then subleased the property to A & S Texaco, which operated a gas station on the site.
In 1989, the New Jersey Department of Environmental Protection ("DEP") began investigating the source of gas vapors emanating from a storm drain along the property's western boundary. DEP found gasoline-contaminated soil and groundwater.
Ride hired Hudson to provide environmental consulting and remediation services at the site. On March 25, 1998, Ride and Hudson entered into a cleanup agreement that required Hudson to perform clean-up services at the Alpine Texaco site for a fixed sum of $250,000. Hudson agreed to do all work necessary to obtain, at no additional cost to Ride, a No Further Action ("NFA") letter from the DEP. Hudson also released Ride from "all liabilities and responsibilities related to or arising out of the contamination including but not limited to all known, unknown, and future liabilities related to the contamination that could arise after the issuance of an NFA letter by the NJDEP."
Remediation at the Texaco site began in 1998. Hudson removed gasoline and diesel fuel underground storage tanks ("USTs"), excavated and disposed of contaminated soil, remediated groundwater, and waterproofed a basement  the Grayson property  located down-gradient of the site where gasoline-contaminated groundwater infiltrated. Soil remediation *42 activity continued through May 2002. Approximately 5,400 tons of contaminated soil were excavated and disposed of off-site.
On November 21, 1998, Hudson entered into another agreement with Ride and the neighbor, Grayson. Hudson agreed to assume full responsibility for the final cleanup of the Alpine Texaco site, and sites off-premises, including the Grayson property. Under the November 21, 1998 agreement, Hudson also agreed to become the DEP-ordered party for the clean-up.
On November 24, 1998, Hudson entered into a cleanup agreement with the DEP. That agreement provided that
"the scope of the investigation and remediation ... will include all contamination which has been reported in incident numbers XX-XX-XX-XXXX and XX-XX-XX-XXXX, as well as the abandoned underground waste oil storage tank on-site, and all contaminants, which are emanating from or which have emanated from the Site as a result of the above referenced incident report numbers and the abandoned waste oil underground storage tank on-site."
The cleanup agreement also required Hudson to obtain and maintain environmental "cost-cap" insurance in the amount of the anticipated remediation costs for the duration of the remediation and until such time as the DEP issued an NFA letter for the Alpine Texaco site.
However, at some point, Hudson realized that the costs of its promised cleanups would far exceed its contracted amounts. Around September 1999, Hudson informed Reliance that the work being performed under the policy's scope of work would exceed the $275,000 retention amount. ECS Claims Administrators, Inc. ("ECS"), the administrator of Hudson's claim on behalf of Reliance, requested that Hudson submit its invoices for work performed to date. As of October 25, 1999, Hudson had submitted to ECS invoices totaling $334,291.61 for services performed through September 1999. Hudson requested payment of $59,291.61  $334,291.61 minus the $275,000 SIR.
On or about November 5, 1999, ECS paid Hudson $59,291.61 under the policy's remediation stop loss coverage. ECS then made sixteen more payments through August 27, 2001, totaling $302,127.52, covering work completed between October 1999 and April 2001. Thus, ECS paid Hudson $361,419.13 under the policy's remediation stop loss coverage. ECS also made payments to Golder Associates, Inc., totaling $7,517.73, and to Berliner & Associates totaling $1,000. Reliance had hired these firms to assist with claims administration.
Throughout Hudson's remediation efforts, the Grayson basement was a source of difficulty. After Hudson's initial efforts to restore the basement did not satisfy Mr. and Mrs. Grayson, ECS retained Golder Associates, Inc., to evaluate the basement and offer proposed solutions. Golder suggested three options for correcting the problem, but ECS expressed concern that they were outside the policy's scope of work.
Hudson and ECS entered into an agreement on November 27, 2000, which purported to set forth a cost-splitting arrangement between the parties. The parties agreed that Hudson would pay one-third of the first $75,000 and ECS would pay the remaining two-thirds of that $75,000. ECS would then assume responsibility for payment of all costs above $75,000. The parties now disagree about whether the cost-sharing arrangement was to cover only one specific remedy to the Grayson basement problem (filling the basement with concrete and constructing an addition to the Grayson house) or to any remedy ultimately pursued (e.g., injecting additional *43 grout into the foundation and pouring an additional concrete slab to raise the level of the basement). The November 27, 2000, agreement was memorialized in a letter from William R. Hoffman, Vice President of ECS, which was signed by Robert N. Glaser, counsel for Hudson. The writing indicates that Hudson should "review the foregoing in light of [the] verbal agreement" between the parties.
While administering Hudson's claim, ECS indicated that it would not pay for a "markup" on profits contained in Hudson's invoices. After meeting with ECS representatives on February 8, 2000, Hudson agreed to reduce its standard pricing by ten percent, which would be reflected as a credit on each invoice. Hudson also agreed that it would not charge a markup on subcontractors' services. Hudson claims that this agreement resulted from negotiations about the pace of ECS's claims processing. Hudson alleges that it reduced its invoices by ten percent in return for faster claims processing. (Hudson now argues that the ten percent discount no longer applies, because PLIGA has breached the ECS agreement by refusing to pay its invoices at all, let alone promptly.)
On or about August 14, 2001, ECS asked Hudson to provide copies of daily time sheets and a more specific description of its services in connection with Invoice Number 5111, for $3,205.23, which Hudson had previously submitted for payment. ECS was concerned that Hudson billed for a field technician to pump out the Grayson's basement. Hudson has claimed that ECS failed to consider the time required for system maintenance and other contingencies that occurred during the pump-out process. Hudson has added that this correspondence was nothing more than posturing by ECS and that at one point, attorneys for the Graysons alleged that ECS was in breach of its contract with them.
In letters dated September 10, 2001, and September 25, 2001, ECS informed Hudson that it had concerns about its billing practices. ECS alleged that Hudson had been billing for time spent on the phone with ECS, and charging rental rates for use of its own equipment and vehicles. Hudson asserts that ECS also questioned the use of equipment that was required by the NJDEP, questioned standard charges for sampling that ECS accepted at the February 10, 2000, meeting with Hudson, and questioned the time spent by a project manager to determine the remediation techniques.
On or about October 8, 2001, ECS provided Hudson with a detailed description of what it deemed to be "questionable charges" on invoices 5111 and 5169.

Hudson Seeks Payment From PLIGA
Reliance National Insurance Company was placed in liquidation on October 3, 2001. PLIGA notified Reliance's policy-holders in New Jersey, and all parties having claims against them, that PLIGA would administer Reliance claims pursuant to N.J.S.A. 17:30A-1 to -20.
Beginning in January 2002, Hudson attempted unsuccessfully to obtain payment from PLIGA, which slowly processed and ultimately denied most of Hudson's claim. As a result of the non-payment, Hudson asserts that it lacked the operating capital to continue the cleanup, and consequently could not submit invoices for otherwise covered expenses during the policy period.
In January 2002, Hudson's general counsel, Robert Glaser, contacted Donald J. Camerson at Bressler, Amery & Ross, P.C. ("Bressler"), counsel for PLIGA in this case, to determine who was handling the file and the status of the claim. Camerson indicated he needed to speak with *44 one of his colleagues to determine the status. He asked Glaser to give him a few weeks and then call him back.
In March 2002, Glaser again spoke with Camerson about the status of the case. Camerson indicated that Bressler, Amery & Ross had previously represented PLIGA and might be able to reach a resolution of Hudson's claims with PLIGA. Camerson indicated that although he was very busy he would get back to Hudson about it.
In June or July of 2002, Glaser again spoke with Camerson, who indicated that Hudson might have a valid claim. Camerson stated that Bressler might be able to expedite the claim for Hudson because it did a lot of this type of work, and that he would have an associate look into the matter.
Still not having heard anything definitive, Eric Schlauch, Hudson's president, sent an email to Camerson at Bressler on October 7, 2002, inquiring about the status of the matter. Schlauch also made a phone call to Camerson around this time to determine the status and left a message on Camerson's voicemail.
On October 8, 2002, Stephanie Hopkins, an attorney with Bressler, returned Schlauch's phone call. She indicated that she had not done any work on the file. She also indicated that she had spoken with Jim Casey of PLIGA and confirmed there were no coverage issues. Hudson claims that this conversation gave Schlauch the impression that PLIGA would pay Hudson in full.
At Hopkins' recommendation, Schlauch called Casey on October 9, 2002. During this phone conversation, Casey asked Schlauch for a history of the project and copies of all outstanding invoices. Schlauch was surprised and disappointed that Casey did not already have this information. On October 14, 2002, Schlauch sent Casey the requested information.
On October 17, 2002, Schlauch called Casey to confirm that he had received the invoices and his correspondence. Schlauch was informed that Casey was no longer with PLIGA. Schlauch claims he spoke with a PLIGA employee named Ann who said she would pass the file along to a new adjustor.
Schlauch left at least four telephone messages with PLIGA in late October and early November 2002 requesting that someone contact him about the file. On or about November 14, 2002, Schlauch was referred to William Davis, another PLIGA claims adjustor. During a telephone conference on the same date, Davis indicated he had no invoices and no historical information about Hudson's case. Schlauch agreed to re-send Davis everything he had previously sent to Casey. By correspondence dated November 19, 2002, Davis sent what appears to be a form letter to Schlauch about PLIGA's basic claims procedures.
Around November 2002 Hudson was forced to significantly curtail remediation efforts at the Alpine Texaco Site and the Grayson's basement because it could not afford to continue work without any cost-cap insurance protection. Hudson continued to pump water and conduct indoor air quality tests at the residence on a weekly basis. The Graysons routinely expressed frustration with the continued presence of Hudson employees on their property.
By letter dated December 12, 2002, to Davis, Schlauch demanded payment of the then-outstanding amount of $113,500.93, and asked for instructions on how Hudson should proceed. Sometime in late December 2002 or early January 2003, Schlauch called Davis, who indicated that he received Hudson's December 12 letter, and that he had forwarded the matter to the *45 PLIGA board. Davis promised he would call back soon with a response. On January 10, 2003, Davis called Schlauch and stated the matter was still being reviewed. On January 14, 2003, Davis again spoke with Schlauch and apologized for not having an answer.
In a telephone conference with Schlauch and Glaser on January 21, 2003, Davis stated that the $275,000 SIR counted against PLIGA's $300,000 statutory limit, and therefore, PLIGA would pay Hudson only $25,000. Both Hudson representatives disagreed with PLIGA's view of the impact of the SIR. (On an earlier motion for summary judgment, this court rejected PLIGA's view and found that the SIR did not reduce PLIGA's $300,000 limit of coverage.) Consistent with PLIGA's view, Davis sent Schlauch a proposed general release in exchange for settling this matter for $25,000.
The record does not reflect the extent of PLIGA's investigation of Hudson's work at the Alpine Texaco and Grayson basement sites, or the unpaid invoices. Hudson asserts that PLIGA has not made any effort to settle this matter and has paid Hudson nothing on its claims. In the meantime, DEP has issued numerous ultimatums to Hudson about remediating the site. The Graysons previously threatened litigation about the site as well, but had allowed Hudson time to resolve its action with PLIGA.
Hudson asserts that several steps are needed to obtain an NFA letter. Hudson must excavate, and dispose of 530 tons of contaminated soil; install wells; remediate groundwater; sample indoor air at the Grayson residence; prepare a Remedial Action Workplan to support a natural attenuation proposal; monitor groundwater for two years to confirm decreasing contaminant concentrations; and fill the basement and build an addition to the Grayson residence. Hudson estimates that the additional work necessary to obtain an NFA letter from the DEP would cost over $228,000. Hudson anticipates that after DEP issues an NFA letter, additional groundwater monitoring will be necessary, as well as sealing all wells. The estimated cost of these tasks is $12,000.
Hudson has submitted to PLIGA thirty-two invoices dated between March 30, 2001, and October 31, 2003, which it claims reflect un-reimbursed work performed at the properties. As of April 2, 2004, PLIGA had made no payments at all to Hudson.
PLIGA claims that there are genuine issues of fact regarding the appropriateness of Hudson's billing entries, raising questions like those that ECS raised around the time of Reliance's insolvency. However, PLIGA does not identify any specific problems with individual invoices, other than to claim that Hudson failed to reduce the invoices by ten percent, pursuant to Hudson's agreement with ECS.
Hudson claims that the policy period should be extended beyond November 24, 2003, because of PLIGA's alleged breach  its bad faith failure to process and to pay claims timely. Hudson significantly curtailed its work at the Alpine Texaco and Grayson basement sites in November 2002 because it could not afford to continue to work without the protection of its cost-cap insurance. It now argues that the contract should be reformed to include the total cost of its work on the sites because it would not have needed to cut back its activities if PLIGA had timely paid its claims. The total amount of Hudson's unpaid invoices for its work from about March 7, 2001, through about October 28, 2003, is $172,292. As previously noted, Hudson paid this amount out-of-pocket.

*46 PROCEDURAL HISTORY

Hudson filed suit in this case on May 28, 2003, before the policy expired. The complaint seeks declaratory judgment that PLIGA is obligated to pay for the past and future clean-up costs associated with the Alpine Texaco site and the adjoining properties. Hudson alleges that: PLIGA assumed Reliance's obligations under the cost-cap insurance policy and breached its contractual duties thereunder by failing to pay for the clean-up costs covered by the policy; PLIGA is liable for damages resulting from its breach of the covenant of good faith and fair dealing; and PLIGA has failed to try "in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear" in violation of N.J.S.A. 17:29B-4(9)(f). In addition tion to the declaratory judgment, Hudson demanded attorneys' fees, interest, costs, and expenses.
In late 2003, Hudson filed a motion for summary judgment seeking a determination that the policy's stated coverage limit of $750,000 for remediation stop loss coverage was not reduced by the $275,000 SIR. PLIGA argued that the policy only provided $475,000 of coverage  $750,000 minus $275,000. Thus, PLIGA argued, inasmuch as Reliance paid claims of close to $370,000, only $105,000 remained payable on the policy.
This court held that the SIR did not reduce the policy limit. The court relied on the terms of the policy itself, the accepted distinction in the insurance industry between a deductible and a SIR, and the PLIGA statute.
PLIGA then filed the instant summary judgment motion, seeking to dismiss Hudson's claims of breach of contract, breach of the covenant of good faith and fair dealing, and violation of the Unfair Claim Settlement Practices Act ("UCSPA"). Hudson cross-moved for summary judgment seeking payment of its outstanding invoices and a determination of PLIGA's liability under the theories alleged in the complaint.

DISCUSSION
The principal issue before the court is whether NJ PLIGA, when administering claims for coverage under policies issued by an insolvent insurer, is insulated by N.J.S.A. 17:30A-17 from claims for consequential damages or reformation based on PLIGA's alleged bad faith or breach of the duty to pay claims timely. The court must also decide whether PLIGA is potentially liable to Hudson for unfair methods of competition and unfair and deceptive acts or practices that violate N.J.S.A. 17:29B-4. These are legal issues that the court can decide on this motion. The court will review the summary judgment standard; and then construe the statutory provision.
This court finds that (a) PLIGA is immune as a matter of law under the Guaranty Act, and (b) there is no right of action against PLIGA for violating the UCSPA. Therefore, PLIGA is entitled to judgment dismissing Hudson's bad faith and UCSPA claims. It is so entitled, even if it acted in bad faith as Hudson alleges, and even if Hudson suffered consequential damages because PLIGA wrongfully refused to pay Hudson's claims.

1. Summary Judgment Standard.

The standard for summary judgment is well settled. See R. 4:46-2; Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995). A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of *47 law." Id. at 528-29, 666 A.2d at 150 (quoting R. 4:46-2).
PLIGA generally does not dispute Hudson's allegations that PLIGA delayed processing Hudson's claims and refused to pay more than $25,000. While PLIGA does not concede that these facts constitute bad faith or grounds for reformation of the policy, PLIGA seeks judgment on this motion based on the legal argument that the immunity provision bars Hudson's bad faith claim and the UCSPA does not permit private actions. Thus, as to the immunity defense, the dispositive issue is one of statutory construction. Likewise, construction of the UCSPA is a purely legal issue. Thus, the case is ripe for summary judgment. See, e.g., Clark v. Degnan, 163 N.J.Super. 344, 368, 394 A.2d 914, 925-26 (Law Div.1978) (purely legal issue ripe for summary judgment), aff'd as modified, 83 N.J. 393, 416 A.2d 816 (1980).

2. The PLIGA Act

The novel issue for the court is the scope of PLIGA's immunity. PLIGA's claim of immunity is grounded in section 17 of the PLIGA Act. Entitled "Immunity from liability of persons acting under this law," its plain language apparently provides unlimited immunity to PLIGA and its agents and employees from any liability or causes of action "of any nature" taken in the performance of duties or powers under the PLIGA Act.
There shall be no liability on the part of and no cause of action of any nature shall arise against any member insurer, the association or its agents or employees, the board of directors, or the commissioner or his representatives for any action taken by them in the performance of their powers and duties under this act.
[N.J.S.A. 17:30A-17.]
Section 17 is drawn from the National Association of Insurance Commissioners ("NAIC") model statute, first promulgated in 1969 and adopted in one form or another by most states. See NAIC Post-Assessment Property and Liability Insurance Guaranty Association Model Act § 17 (2004).
No reported decision in New Jersey has explored the boundaries of this provision. Consequently, the court's analysis starts with a summary of principles of statutory construction, followed by a review of the plain language of the provision. Inasmuch as the court concludes that the language is unclear, the court will resort to other provisions of the PLIGA Act and the general purpose of the law as aids in interpretation. The court will also analyze other state courts' efforts to interpret similar or identical language.

A. Principles of Statutory Construction.

Understanding a statute must begin with a reading of "the plain meaning of the provision at issue." Burns v. Belafsky, 166 N.J. 466, 473, 766 A.2d 1095, 1098 (2001). Where the language of the statute "is clear and unambiguous, and susceptible to only one interpretation, courts should apply the statute as written without resort to extrinsic interpretative aids." In re Passaic County Util. Auth., 164 N.J. 270, 299, 753 A.2d 661, 678 (2000) (citing Bergen Commercial Bank v. Sisler, 157 N.J. 188, 202, 723 A.2d 944, 950-51 (1999)). If more than one interpretation seems reasonable, a court is required to give the statute the meaning that will effectuate the legislative intent, utilizing extrinsic evidence when it is helpful. Burns v. Belafsky, supra, 166 N.J. at 473, 766 A.2d at 1098-99 . Moreover, a statute should be read as a whole and not in separate sections. Fiore v. Consolidated Freightways, 140 N.J. 452, 466, 659 A.2d 436, 443 *48 (1995). The court's task is to "harmonize the individual sections and read the statute in the way that is most consistent with the overall legislative intent." Ibid. In the end, a court's aim is to "ensure that the Legislature's goal is effectuated." Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 144, 741 A.2d 591, 596 (1999).

B. Plain Language of Section 17.

This court concludes that the plain language of section 17 is unclear. While one might argue that the provision's express terms bar Hudson's claim for reformation or consequential damages, this court finds that the issue is not so easily resolved. Nonetheless, there is ample out-of-state authority for concluding that Hudson's claims are, simply, against "the association or its agents or employees ... for ... action[s] taken by them in the performance of their powers and duties under this act." Therefore, they are barred.
Courts of other jurisdictions have taken this facial approach, relying on nothing more than the statute's plain language to immunize a state guaranty association from a bad faith claim. See, e.g., Fernandez v. Florida Ins. Guaranty Ass'n, 383 So.2d 974, 975 (Fla.Dist.Ct.App.1980) (finding that the plain language of an immunity provision like New Jersey's unambiguously immunized the association from claim that association's alleged refusal to settle claim within policy limits made it liable for jury award exceeding coverage limits); Veillon v. Louisiana Ins. Guaranty Ass'n, 608 So.2d 670, 672 (La.Ct.App.1992) (holding that Louisiana's analog to New Jersey's section 17 immunized state's guaranty's association from liability from "its own independent negligence or breach of fiduciary duty under the policy to settle within the policy limits"); PIE Mut. Ins. Co. v. Ohio Ins. Guaranty Ass'n, 66 Ohio St.3d 209, 611 N.E.2d 313, 318 (1993) (holding that Ohio's analog to New Jersey's section 17 barred holding the Ohio guaranty association liable "for damages caused by... [the association's] failure to properly identify, settle or pay a covered claim"). The Florida court opined that the immunity clause left no room for judicial construction. Fernandez v. Florida Ins. Guaranty Ass'n, supra, 383 So.2d at 975.
Moreover, legislatures of other states have limited their immunity provision's broad scope when they have deemed it appropriate. For example, Alaska's statute almost mirrors New Jersey's section 17, except that it adds, "However, immunity from liability under this section does not apply to wilful or wanton misconduct." Alaska Stat. § 21.80.150. Virginia's statute expressly conditions its immunity on the association's good faith.
There shall be no liability on the part of and no cause of action shall arise against any member insurer, the Association or its agents or employees, the board of directors, or the Commission or its representatives for any action taken or statement made by them in good faith in the performance of their powers and duties under this chapter. The Association's board of directors shall not incur any civil liability for any statements made in good faith under this provision.
[Va.Code Ann. § 38.2-1615].
The New Jersey Legislature's failure to qualify PLIGA's immunity conceivably reflects the Legislature's intent to create a broad, unlimited immunity. The Legislature has certainly fashioned more finely tuned immunity schemes in different contexts when it has concluded it appropriate to do so. See, e.g., N.J.S.A. 2A:53A-7 (immunity from negligence claims against non-profit entities organized for religious, charitable, educational or hospital purposes extends only to beneficiaries and does not cover willful, wanton, or grossly *49 negligent acts, and motor-vehicle-related negligence).
Yet, in this court's view, the issue is more complex than that. While the results in the above cases bolster the result reached here, the reasoning of these cases is ultimately unpersuasive. The broad unqualified statutory language  taken on its face  proves too much. It would shield PLIGA from a suit for payment of the covered loss itself. It conceivably could shield PLIGA from even a declaratory judgment action to establish that coverage exists. Yet, the statute expressly contemplates suit against PLIGA at least for some purposes. See N.J.S.A. 17:30A-8(b) (stating that "[t]he association ... may [s]ue or be sued").
PLIGA's counsel conceded at oral argument that section 17 does not provide unlimited immunity from any and all suits. PLIGA agreed in its motion papers that PLIGA was not immune from a declaratory judgment action to establish coverage in the face of PLIGA's denial of coverage. Also, in response to the court's hypotheticals at oral argument, PLIGA's counsel conceded that PLIGA and/or its agents would not be immune from, among other things, a negligence claim arising out of a slip-and-fall on its premises resulting from a staff person's careless spill of water in preparation for a board meeting; and a PLIGA employee would not be immune from an intentional tort claim (for example, sexual assault) on a fellow employee.
Indeed, at least one court agrees that such claims would fall outside the immunity provision's scope. See Isaacson v. California Ins. Guarantee Ass'n, 44 Cal.3d 775, 244 Cal.Rptr. 655, 750 P.2d 297, 301, n. 2 (1988) (holding that California's immunity provision shielded the California Guarantee Association from tort liability in relation to claims adjustment, but not "ordinary tort liability" such as auto negligence or intentional torts). However, the plain language of the statute might be read to immunize such claims, inasmuch as they conceivably would have occurred as a result of actions by PLIGA employees while they were exercising their powers and performing their duties under this act.
On the other hand, in response to a hypothetical from the court, PLIGA's counsel asserted that if a PLIGA employee refused to process a claim because of a claimant's race, sex, or national origin, PLIGA and the employee would be immune from damages arising out of that action. Also, in response to questioning from the court, PLIGA's counsel asserted that had Burton Pickett's physical damage claim been made not to Lloyds, but to PLIGA, and all the attendant delays in payment of Pickett's claim resulted from PLIGA's, and not Lloyds' actions, then Pickett would have been barred from claiming consequential damages grounded in bad faith. Cf. Pickett v. Lloyd's, 131 N.J. 457, 621 A.2d 445 (1993) (recognizing a right of action for bad faith refusal to pay claim where there was no reasonably debatable reason for not paying).
Yet, the plain language of the statute provides no clear basis for such distinctions. And, it is hard to conclude, for example, that the Legislature intended section 17 to supersede the Law Against Discrimination, which would bar discrimination in the payment of insurance claims. See N.J.S.A. 10:5-12(1) (making it unlawful for any person to discriminate in the sale or provision of services, goods and information). On the other hand, as for liability for a Pickett-like claim, the court agrees that the Legislature intended PLIGA to be immune.
Thus, the court must engage in some line-drawing not apparent from section 17's plain language. Consistent with the principles of statutory construction expressed *50 above, the court will rely in part on other provisions of the PLIGA statute and the Act's general purposes. Without plotting the immunity provision's full scope, or deciding cases not before it, but mindful of the impact of the court's reasoning on other potential cases, the court concludes, based on the principles expressed below, that Hudson's claims of bad faith and consequential damages are barred.

C. The PLIGA Act's Limited Mission.

Barring Hudson's claims is consistent with PLIGA's mission to provide only incomplete relief to victims of an insurer's insolvency. While it is sometimes said that PLIGA "stands in the shoes of the insolvent carrier," the shoes are not PLIGA's, and the fit is not snug. Compare, e.g., Blew v. Brind Leasing, 216 N.J.Super. 359, 362, 523 A.2d 1076, 1078 (App.Div.1987) (invoking "steps into the shoes" concept in holding that when PLIGA is co-primary with another carrier, the coverages of PLIGA and the other carrier must be allocated pro-rata before applying the $300,000 limit), with e.g. Lehmann v. O'Brien, 240 N.J.Super. 242, 248, 573 A.2d 171, 174 (App.Div.1989) (holding that, while solvent carrier may be liable for prejudgment interest on a third-party's claim against an insured tort-feasor, PLIGA is not liable, pursuant to an express exclusion in N.J.S.A. 17:30A-5(d)).
The New Jersey Property-Liability Insurance Guaranty Association Act, N.J.S.A. 17:30A-1 to -20, created PLIGA, a non-profit organization comprised of property and liability insurers, and charged it with protecting insureds in the event of the insolvency of New Jersey insurers. N.J.S.A. 17:30A-2(a), -5(d), -5(e). With limited exceptions, the Act requires that all New Jersey insurers join PLIGA as a condition of doing business in the state. Railroad Roofing & Building Supply Co. v. Financial Fire & Cas. Co., 85 N.J. 384, 389-90, 427 A.2d 66, 68-69 (1981). The money used to pay "covered claims" against such insolvent insurers is raised by "assessments against its member insurers in proportion to the amount of `net direct written premiums' each generates in a particular calendar year." Skandia America Reinsurance Corp. v. Schenck, 441 F.Supp. 715, 719 (S.D.N.Y.1977) (quoting N.J.S.A. 17:30A-8(a)(3)). The cost of providing coverage to the clients of insolvent insurers is then passed on to the members' own clients via increases in rates and premiums. N.J.S.A. 17:30A-16.
The stated purpose of the Act is broad and remedial:
The purpose of this act is to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, to provide an association to assess the cost of such protection among insurers, and to provide a mechanism to run off, manage, administer and pay claims asserted against the Unsatisfied Claim and Judgment Fund, created pursuant to P.L. 1952, c. 174 (C. 39:6-61 et seq.), the New Jersey Automobile Full Insurance Underwriting Association, created pursuant to P.L. 1983, c. 65 (C. 17:30E-1 et seq.), and the Market Transition Facility, created pursuant to section 88 of P.L. 1990, c. 8 (C. 17:33B-11).
[N.J.S.A. 17:30A-2(a)].
See also Carpenter Tech. Corp. v. Admiral Ins. Co., 172 N.J. 504, 514, 800 A.2d 54, 60 (2002) (quoting Senate Bill Statement to S. 1004, c. 17 (April 11, 1974)). The legislation is to be liberally construed. New Jersey Property-Liability Guaranty Ass'n *51 v. Sheeran, 137 N.J.Super. 345, 351, 349 A.2d 92, 95 (App.Div.1975), certif. denied, 70 N.J. 143, 358 A.2d 190 (1976); N.J.S.A. 17:30A-4(a). PLIGA assumes the obligations of insolvent insurers. See N.J.S.A. 17:30A-8(a)(2) (stating that PLIGA shall "[b]e deemed the [insolvent] insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties and obligations of the insolvent insurer as if the insurer had not become insolvent").
On the other hand, in numerous ways, the Legislature restricted the availability of Fund resources to claimants, reflecting an intention that the Act be applied in a way that conserves its limited resources to serve its core purposes. Thus, there is tension between the mandates to liberally construe the statute, and to preserve the Association's resources. Carpenter Tech. Corp. v. Admiral Ins. Co., supra, 172 N.J. at 516-17, 800 A.2d at 61-62. For example, the extent to which PLIGA can be required to pay claims is limited to payment of "covered claims up to the amount of the policyholder's contract but subject to a maximum liability of $300,000." Sussman v. Ostroff, 232 N.J. Super. 306, 311, 556 A.2d 1301, 1303 (App.Div.), certif. denied, 117 N.J. 143, 564 A.2d 865 (1989).
PLIGA's obligations are also limited by an "exhaustion and setoff provision," which requires insureds to first exhaust all non-PLIGA coverage. N.J.S.A. 17:30A-12(b).
[W]here a claim is covered both by a solvent insurer's policy and an insolvent insurer's policy, a policyholder first must exhaust his or her policy with the solvent insurer before NJPLIGA has any statutory obligation to pay the policyholder. "Therefore, until such exhaustion[,] [NJPLIGA], as the `deemed' insurer under the insolvent insurer's policy, has no obligation."
Carpenter Tech. Corp. v. Admiral Ins. Co., supra, 172 N.J. at 516, 800 A.2d at 61 (citations omitted).
The Act also apportions the costs of insolvency to claimants, policyholders and solvent insurance carriers. As noted above, an injured party is not entitled to prejudgment interest on an unliquidated claim against the insured of an insolvent carrier. N.J.S.A. 17:30A-5(d). Also, policyholders are entitled only to the statutory limit of $300,000, regardless of the degree to which the damages exceed that amount. N.J.S.A. 17:30A-8(a)(1). A third-party claimant is not entitled to counsel fees against PLIGA. N.J.S.A. 17:30A-5(d). See New Jersey Guaranty Ass'n v. Max's Bar & Grill, Inc., 242 N.J.Super. 164, 576 A.2d 300 (App.Div.1990) (applying fee-immunity provision). Finally, subrogation claims by solvent insurance carriers are forbidden by the Act. N.J.S.A. 17:30A-5(d).
"[C]learly one concern of the Legislature is `to conserve limited Association resources to better assure their availability to serve core purposes.'" Amer. Employers' Ins. Co. v. Elf Atochem N. Am., Inc., 157 N.J. 580, 590, 725 A.2d 1093, 1099 (1999) (citation omitted) (construing the Act to cover a business entity when its principal place of business is in New Jersey). PLIGA was not designed to operate a benevolent fund. Carpenter Tech. Corp. v. Admiral Ins. Co., supra, 172 N.J. at 515, 800 A.2d at 60-61. Consequently, the Legislature provided a system that "signaled the need for restraint and caution in the payment of claims." Id. Thus, it made clear that the "conservation of NJPLIGA's resources is necessary to achieve the Act's stated goals." Id. at 516, 800 A.2d at 61. (discussing "seeming dichotomy" between two goals).
The immunity provision is of a piece with the other statutory limitations on *52 PLIGA's liability, just described. Just as a claimant is remediless if (a) his losses exceed $300,000, (b) he seeks prejudgment interest or counsel fees, or (c) he seeks payment before exhausting other coverages  a claimant has no remedy for botched claim processing or bad faith failure to pay. In short, the Act, taken as a whole, reflects the Legislature's desire to make PLIGA's liability narrower than what would have attached to the insurer, if it were acting instead of PLIGA.
Other courts have relied on the limited mission of the guaranty association, in construing their respective states' immunity provision to bar bad faith claims. While asserting that the Hawaii provision was unambiguous, the Supreme Court of Hawaii nonetheless relied on the limited mission of its guaranty association in concluding that claims of bad faith, tortious breach of contract, and negligent infliction of emotional distress were all barred. The court referred to the Legislature's apparent desire to limit the guaranty association's exposure, which the premium-paying public would ultimately bear through premium surcharges.
HIGA [Hawaii Insurance Guaranty Association] is not a traditional for-profit insurance company. It is a non-profit entity.... The costs of operations of HIGA are recouped ... by means of a premium surcharge.... The legislature has therefore made a policy determination to limit HIGA's exposure to liability for its handling of covered claims. Where the unambiguous language of the statute mandates a particular result, we are bound to follow it. [Mendes v. Hawaii Ins. Guaranty Ass'n, 87 Hawai'i 14, 950 P.2d 1214, 1219 (1998).]
The Pennsylvania Superior Court, in barring a claim of bad faith failure to settle, also relied on the fact that the guaranty association was not designed to replace the insolvent carrier. Schreffler v. Pennsylvania Ins. Guaranty Ass'n, 402 Pa.Super. 309, 586 A.2d 983, 985 (1991). The court stated that the immunity provision was clear. Ibid. Yet, the court also relied on the Pennsylvania legislature's intent to create a limited remedy for policyholders of insolvent insurers.
[T]he Act does not intend to place a claimant in all cases in the same position she would have been had the insurance company remained solvent. The Act created a means by which limited recovery may be had in instances where none would have been possible due to the insolvency. Where the Act explicitly denies a recovery, creates an immunity, or bars a cause of action, that provision must be strictly construed.
[Ibid.].
In sum, the Legislature's intent to afford only limited relief to policy-holders generally supports immunity from bad-faith claims. However, the general intent to limit relief does not provide a rule for determining when the immunity applies and when it does not.

D. Other Courts' Line Drawing.

Other courts have grappled with the vague breadth of their states' immunity provisions. Yet, for various reasons, their line-drawing efforts do not offer a persuasive guide for construing New Jersey's Act. For example, in barring bad faith claims, Arizona and California courts have construed their immunity provisions as barring tort claims, but not contract claims. The Arizona courts reason that bad faith claims sound in tort. Therefore, they are barred. Bills v. Arizona Prop. and Cas. Ins. Guaranty Fund, 194 Ariz. 488, 984 P.2d 574, 580 (Ct.App.1999) (reasoning that the Fund is liable only for "covered claims," which exclude *53 tort claims such as a claim of bad faith refusal to settle); Wells Fargo Credit Corp. v. Arizona Prop. and Cas. Ins. Guaranty Fund, 165 Ariz. 567, 799 P.2d 908, 914 (Ct.App.1990) (stating that the Fund is immune from tort liability, and, therefore, claim of bad faith). The California Supreme Court likewise has held that its guaranty association is immune from tort claims arising out of the claims adjustment process. Isaacson v. California Ins. Guarantee Ass'n, supra, 750 P.2d at 307.
Incidental to this argument, the Arizona court reasoned that a tort claim was, by definition, not a "covered claim," because it did not "arise out of" nor "within the coverage of an insurance policy" subject to the guaranty fund. Therefore, the Fund could not pass on the cost of paying such claims to member insurers. The court concluded that the Legislature could not possibly have intended that its fund would be liable for judgments the cost of which could not be passed on to member insurers. Bills v. Arizona Prop. and Cas. Ins. Guaranty Fund, supra, 984 P.2d at 580. See also Wells Fargo Credit Corp. v. Arizona Prop. and Cas. Ins. Guaranty Fund, supra, 799 P.2d at 913-14 (reaching same conclusion).
By contrast, our Supreme Court has concluded that a cause of action for an insurer's bad faith failure to pay is "best characterized as sounding in contract," notwithstanding that most jurisdictions characterize the cause of action as an independent tort. Pickett v. Lloyds, supra, 131 N.J. at 469-70, 621 A.2d at 451-52. Therefore, construing the immunity provision to exclude only tort claims would not preclude a bad faith claim at all under New Jersey law.
Moreover, if PLIGA were liable only for claims that could be passed on to member insurers as "covered claims," then it would be immune from premises liability and intentional torts as well  because those are not within the coverage of guaranteed policies. See N.J.S.A. 17:30A-5(d) (defining "covered claim" to mean an "unpaid claim ... which arises out of and is within the coverage ... of an insurance policy to which this act applies...."). Also, if the Act allowed only claims that could be passed on to member insurers, then there would be little need for the immunity provision at all. This court does not construe the statute so as to render section 17 almost superfluous. See, e.g., Paper Mill Playhouse v. Millburn Tp., 95 N.J. 503, 521, 472 A.2d 517, 526 (1984) (stating that any statutory construction that would render provision meaningless or superfluous should be avoided).
Nor does it seem helpful to justify immunity from bad faith claims on an alleged lack of privity between a guaranty fund and an insured. Compare Isaacson v. California Ins. Guarantee Ass'n, supra, 750 P.2d at 306-07 (finding trial court was correct to reject common law bad faith claim against California Insurance Guarantee Association because of lack of contractual privity between plaintiff and CIGA), with Bills v. Arizona Prop. and Cas. Ins. Guaranty Fund, supra, 984 P.2d at 578 (rejecting alleged lack of privity as basis for barring bad faith claim, reasoning that Arizona fund assumed the insolvent insurer's contractual obligations). Indeed, the privity argument seems to fly in the face of the express provision of the Act, under which PLIGA assumes the insolvent insurer's contractual obligations and has "all rights, duties and obligations of the insolvent insurer." N.J.S.A. 17:30A-8(a)(2). At bottom, the problem with the privity analysis, as well as the contract-tort distinction, is that both are unmoored to the language of the statute.
On the other hand, this court finds unpersuasive such a narrow reading of an *54 immunity provision that the only duties or actions subject to immunity are those performed in compliance with law. The Alaska Supreme Court accepted the argument that another state's guaranty association's alleged bad faith refusal to settle claims violated its statutory duty to adjust claims fairly and reasonably. In that court's view, because the guaranty law only immunized the association for actions "in the performance of [its] powers and duties," the immunity provision did not cover the association's bad faith actions. Washington Ins. Guaranty Ass'n v. Ramsey, 922 P.2d 237, 243 (Alaska 1996).
This interpretation turns the immunity shield into a sieve, immunizing PLIGA only when its agents or employees committed no wrong and had little need for protection. The Arizona court rejected similar reasoning, stating that "`[t]o accept plaintiff's contention that statutory immunity is automatically unavailable [when bad faith is alleged] would completely dilute, if not altogether eliminate' the immunity provision." Bills v. Arizona Prop. and Cas. Ins. Guaranty Fund, supra, 984 P.2d at 579 (citation omitted). This court agrees.
In this court's view, the language of the statute  albeit vague  and the public policy goals of the statute and comparable immunity statutes, provide the material for fencing-in the otherwise sprawling immunity.

E. Immunity For Claims Adjustment, Processing and Payment.

In charting the boundaries of PLIGA's immunity, one begins with the language itself of section 17. Key is the clause that PLIGA is immune from liability for an "action ... taken... in the performance of ... powers and duties under this act." As discussed above, the "powers and duties" clause is subject to varying interpretation. In this court's view, however, the "powers and duties" are restricted to actions incidental to claims adjustment, processing and payment.
In determining whether liability arises from "an action ... in the performance ... of powers and duties," it is helpful to consider whether the harm would occur if there were no PLIGA at all. Aside from the covered claim itself, the Legislature apparently did not intend to make PLIGA liable for harms that arise as much out of the insolvency of the insurer as PLIGA's exercise of its powers and duties. For example, in this case, Hudson asserts that it suffered damages as a consequence of PLIGA's slow processing and refusal to pay for covered losses. Yet, had PLIGA not existed at all, Hudson would have suffered much the same loss (putting aside that it might not have relied on its expectation of payment by PLIGA). Reliance's insolvency would have interrupted Hudson's cash flow even more severely than PLIGA's processing and payment delays.
The same may not be said of personal injury or intentional torts by PLIGA personnel. Reliance's insolvency would not cause a person to slip on water spilled by a PLIGA staffer, or subject a claimant to the emotional distress of discrimination or the physical and emotional injury from sexual assault. Had an insured of an insolvent company remained where the insolvency left him, he would be unpaid, but he would not be a victim of personal injury or an intentional tort.
Nonetheless, the immunity under section 17 does not extend to liability for the covered claim itself. That would shield PLIGA from doing what it was created to do  pay insured claims up to the $300,000 cap. The Legislature could not have intended to bar policy-holders from bringing suit to secure the basic benefit that the Act was drafted to provide. See Hubbard v. *55 Reed, 168 N.J. 387, 392, 774 A.2d 495, 498 (2001) (stating that a court should reject a literal interpretation of a statute where it would lead to results inconsistent with the statute's overall purpose). Thus, reading the immunity provision in concert with PLIGA's obligation to pay "covered claims," it appears that the immunity only affects potential liability outside the obligation to pay covered claims.
Yet it does not, contrary to the Arizona court's view, immunize any and all actions outside of covered claims. That would extend the immunity too far, to include liability for torts to third parties. Compare Bills v. Arizona Prop. and Cas. Ins. Guaranty Fund, supra, 984 P.2d at 580 (stating that immunity bars liability for claims not within "covered claims"). Rather, negligence outside of the claims adjustment, processing and payment functions  such as negligence causing personal injury or intentional torts  likewise falls outside the scope of the immunized functions. See Isaacson v. California Ins. Guarantee Ass'n, supra, 244 Cal.Rptr. 655, 750 P.2d at 301 n. 2.
One may argue that if a PLIGA employee spills water that causes a slip and fall on PLIGA grounds, or sexually harasses a claimant, the action is taken "in the performance ... of powers and duties." Nonetheless, the court conceives of no reason the Legislature would have intended "powers and duties" to be so broadly applied. Indeed, the duty to act with the care of a reasonable person, and the duty to refrain from intentionally injuring another, are duties that arise not from the Act, but from the pre-existing common law.
In other contexts, the Legislature has created immunity from suit in order to encourage persons to act when they otherwise have no duty to act. See Praet v. Borough of Sayreville, 218 N.J.Super. 218, 225, 527 A.2d 486, 489 (App.Div.1987) (stating that the unifying purpose of Good Samaritan Act, N.J.S.A. 2A:62A-1, was "to induce voluntary rescue by removing the fear of potential liability ... as an impediment to such [action]"), certif. denied, 108 N.J. 681, 532 A.2d 253 (1987). That is not an apparent policy basis for the immunity in the PLIGA statute. The statute elsewhere creates a duty to act. Section 17 is not needed to incentivize PLIGA or its agents to do what they have been hired to do.
Rather, the immunity in section 17 appears designed to husband PLIGA's resources, to preserve them for its central mission, and to assist in planning. That is consistent with a pervasive purpose to preserve resources. See Carpenter Tech. Corp. v. Admiral Ins. Co., supra, 172 N.J. at 516, 800 A.2d at 61 (stating that conserving PLIGA's resources is necessary to achieve the Act's goals); and discussion above at Point 2C. In that respect, one may draw analogies to the Charitable Immunity Act, which immunizes charitable entities in order to preserve their resources for their underlying mission. Ryan v. Holy Trinity Evangelical Lutheran Church, 175 N.J. 333, 341-42, 815 A.2d 419, 424 (2003) (charitable immunity designed to preserve charitable funds and encourage altruistic activity). The immunity represents the policy judgment that preserving the charitable trust fund, for the benefit of others, outweighs the interests of an injured beneficiary to compensation. See Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29, 55, 141 A.2d 276, 291 (1958) (Heher, J., dissenting) (discussing balance between charity's interests and injured party's interests).
Likewise, the immunity  particularly in the case of bad faith claims  shields PLIGA from consequential damages in excess of the express contractual amounts. In *56 that regard, the immunity is analogous to the State's immunity for consequential damages for breach of contract. N.J.S.A. 59:13-3 (waiver of immunity for contractual liability does not extend to consequential or punitive damages). That immunity, also, is designed in part to shield the State from contractual liability that it cannot foresee. See Allen v. Fauver, 167 N.J. 69, 79-80, 768 A.2d 1055, 1061 (2001) (Long, J., dissenting) (stating that immunity from consequential damages is designed to shield the State from losses that "it could not foresee or for which it could not plan").
Particularly regarding claims by an insolvent insurer's policy-holders  who, absent PLIGA, would have no remedy at all  the Legislature appears to have concluded that a limited remedy is most appropriate. It strikes a balance between mitigating the losses of the policy-holder, preserving resources for other claimants, and enabling PLIGA to manage and plan the disposition of claims.
Planning is especially important because, in the wake of an insolvency, PLIGA is often called upon to assume processing of numerous claims all at once. The associated bureaucratic challenge is substantial. Under the circumstances, it would be unreasonable to hold PLIGA liable if it moves too slowly, misplaces a file, or otherwise delays processing or payment. Thus, like the beneficiaries of charities who may not easily sue the charities that serve them, N.J.S.A. 2A:53A-7, and the beneficiary of a Good Samaritan who may not complain of his helper's negligence, N.J.S.A. 2A:62A-1, an insured of an insolvent insurer may not complain that PLIGA has done harm while attempting  however carelessly, negligently, or ineptly  to fulfill its statutory powers and duties.
In short, the "power and duties" should be limited to claims adjustment, processing and payment functions  even when performed negligently or in bad faith. But there is no evidence that the immunity was intended to override other rights of action created by the Legislature, such as a right of action under the New Jersey Law Against Discrimination, as it would apply to those functions. See Hinfey v. Matawan Regional Bd. of Educ., 77 N.J. 514, 527, 391 A.2d 899, 905 (1978) (rejecting argument that education statute impliedly repealed Law Against Discrimination; statutory incompatibility must be inescapable).
Thus, the immunity afford by section 17 applies only to liability in excess of the coverage itself. PLIGA is immune from claims of consequential damages, or other forms of relief, grounded on the allegation that it adjusted, processed or paid claims in bad faith. Nonetheless, PLIGA remains liable for the insurance coverage up to $300,000. The conclusion reached here is consistent with the result, if not the reasoning, of the majority of states that have determined that their guaranty laws immunize their funds from claims of bad faith settlement or claims adjustment.

4. Unfair Claims Settlement Practices Act Claim

Lastly, this court also grants summary judgment dismissing Hudson's claim for damages arising out of PLIGA's alleged violation of the UCSPA. The UCSPA regulates insurance trade practices and proscribes those practices that "constitute unfair methods of competition or unfair or deceptive acts or practices...." N.J.S.A. 17:29B-1. Hudson's claim fails for two reasons.
First, the UCSPA only regulates the practices of insurers, and PLIGA is not an "insurer" as defined by N.J.S.A. *57 17:22A-28 and N.J.S.A. 17:30A-5(e). Second, it is well-settled that insureds have no private cause of action under the statute, in any event. Pierzga v. Ohio Cas. Group of Ins. Companies, 208 N.J.Super. 40, 47, 504 A.2d 1200, 1204 (App.Div.), certif. denied, 104 N.J. 399, 517 A.2d 402 (1986). Instead, the remedy for violation of the statute rests with the Department of Banking and Insurance. Ibid. In short, Hudson cannot maintain a claim against PLIGA under the UCSPA as set forth in N.J.S.A. 17:29B-4(9).

CONCLUSION
Partial summary judgment is granted, dismissing with prejudice Hudson's claims for relief arising out of PLIGA's alleged bad faith and alleged violation of the UCSPA.